Argued May 5, 1969, reversed and remanded
February 4, 1970

ESCOBEDO, *Respondent, v.* WARD, *Appellant.*
464 P. 2d 698

*c*

Ronald L. Marceau, Bend, argued the cause for appellant. On the briefs were McKay, Panner, Johnson & Marceau and Dennis C. Karnopp, Bend.

Wendell Gronso, Burns, argued the cause for respondent. On the brief were Cramer & Gronso, Burns, and Bodie, Minturn & Glantz, Prineville.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN,* DENECKE and HOLMAN, Justices.

McALLISTER, J.

This is an action brought by Gonzalo Escobedo to recover damages for the death of his seven-year-old son, Juan, who was killed by an earth slide while playing in a gravel pit from which defendant had been excavating gravel and dirt. The jury found for plaintiff and defendant appeals.

The errors assigned on appeal include the denial

---

* Goodwin, J., resigned December 19, 1969.

of defendant's motion for a directed verdict, the denial of his motion to strike from the complaint certain specific allegations of negligence and the giving of, and refusal to give, certain instructions regarding damages.

There was evidence from which the jury could have found the following facts. Defendant Ward contracted with the city of Nyssa to install two water pumping facilities and about 2,000 feet of pipeline. The pumping plant was located in Idaho just across the Snake River from Nyssa and the pipeline extended from Nyssa across the Snake River bridge and thence to the pumping plant. The contract required defendant to backfill the pipeline trench with gravel and to place dirt fill around the two pump houses.

The defendant obtained the necessary gravel and dirt from a gravel pit located in Idaho about seven hundred feet east of the east end of the Snake River bridge and about 100 feet south of the highway. He obtained permission to take material from the pit through the City Manager of Nyssa, to whom defendant paid $50 for transmittal to a Mr. Stringer, who was the reputed owner of the pit. After the tragedy it was ascertained that the pit was not on Stringer's property, but on the right-of-way owned by the state of Idaho.

The pit had been formed by digging into the base of a hill on the south side of the highway. Over the years several thousand yards of material had been excavated from this site until the south bank had reached a height at the center of the pit of about 40 feet. Apparently the pit was used by anyone who needed dirt or gravel. There is no evidence that anyone ever exercised any supervision or control over the pit or the taking of material therefrom.

Defendant's crew took material from the pit from the middle of April until the end of May 1966. Defendant testified that "all the dirt material that came from the immediate area where the boy was killed was removed on one day in the latter part of April." The dirt removed on that occasion amounted to 250 or 300 yards. The dirt was loaded into trucks with a large rubber-tired tractor with a scoop bucket on the front capable of loading large dump trucks in three or four bucketfuls. The defendant described the way dirt was obtained as follows:

"A Well, as we proceeded towards the bank the bucket would be advanced towards the bank at the bottom of the pit. As the material was encountered and forced into the bucket the bucket would be raised to completely fill the bucket as the bucket was coming up.

"Q All right. Now, after you removed the loose dirt from the bottom how would you go on into the bank?

"A We would just—The bucket was equipped with several large teeth. We would stick the teeth into the bank and raise up and this would dislodge the material and it would fall down. And then we would come back and pick it up.

"Q Now how far could you raise this bucket up into the air?

"A About fifteen feet.

"Q Now, would you at some times shove the teeth of the bucket into the bank and lift to cause the dirt to fall free so it would fall into the bucket?

"A Oh, yes, we do that.

"Q And you naturally could only reach—as you were digging into the bank you could only reach up to fifteen, about fifteen feet?

"A Well, the teeth would only reach fifteen feet. But the teeth were of sufficient size and the

loader had sufficient power that we could dislodge the material above the bucket all the way to the top.

"Q    And about how far was it, total, from the bottom to the top at this area?

"A   Well, in the neighborhood of thirty-five feet.

"Q   In other words, it was strong enough that you would push it up and after you dug it out, got underneath it more or less with the bucket you could push up and dislodge it all the way to the top?

"A   That's correct."

Defendant testified that he removed in all about 500 yards of material from the pit. The material, aside from the fill dirt, was gravel obtained toward the sides of the pit. Defendant continued to take gravel from the pit intermittently until the end of May. During that period material was also taken from the pit by others, but the evidence is indefinite as to the extent and frequency of such takings. Defendant testified that no one took as much material from the pit as he did.

Juan Escobedo was killed on May 29, 1966, while he was running with other boys at the base of the bank in a game of "follow the leader." He was killed at about the center of the pit when dirt and sand fell from the bank and covered him.

Defendant testified that the face or bank of the pit was "substantially vertical or possibly a little back from vertical." He further testified that the bank was "dangerous and unstable" when he began his excavation and that it was "dangerous and unstable" when he finished. He said the bank "was in the same

condition when we left as it was when we got there."
Defendant also testified, however, as follows:

"Q So you would have changed the face of it, of the pit, would you not?

"A Oh, any excavation would have changed the face of the pit."

The basis of defendant's liability is well expressed in Restatement of Torts 2d, 295, § 386.[1] Under that section the test of defendant's liability is whether he created on the land of another an artificial condition which he should have recognized as involving an unreasonable risk of harm to others who might come upon the land. This is the test which this court seemed to apply in *Cooper v. North Coast Power Co. et al,* 117 Or 652, 244 P 665, 245 P 317 (1926); *Pate v. Parker et al,* 180 Or 330, 177 P2d 250 (1947). See, also, *McFarland v. Commercial Boiler Works, Inc.,* 10 Wn2d 81, 116 P2d 288, 292 (1941).

In this case the question is whether defendant participated in creating a risk of harm to others who might be imperiled by the dangerous condition. If defendant participated substantially in creating the dangerous condition he would be liable for the entire harm, even though prior excavators had also contributed to the creation of the hazard. Restatement of Torts, 434, § 875.[2]

[1] "Any person, except the possessor of land or a member of his household or one acting on his behalf, who creates or maintains upon the land a structure or other artificial condition which he should recognize as involving an unreasonable risk of physical harm to others upon or outside of the land, is subject to liability for physical harm thereby caused to them, irrespective of whether they are lawfully upon the land, by the consent of the possessor or otherwise, or are trespassers as between themselves and the possessor."

[2] "Except as stated in § 881, each of two or more persons

■ Although the question is a close one we think there was evidence from which the jury could infer that defendant's excavations in the pit increased the risk of harm from slides. The jury could have found (1) that defendant removed a comparatively large quantity of earth from the center of the pit face at its highest point; (2) that Juan was buried at or near the center of the pit face within 30 days after defendant had excavated about 300 yards of dirt at that point; (3) that defendant, to use his words, "changed the face of the pit"; (4) that defendant's excavation, by increasing the height of the face increased the danger; and (5) that the method used by defendant to dislodge dirt would leave the pit face in an unstable condition.

An engineer called by plaintiff testified that the bank "caved off" because it was in an unstable condition and that the method used by defendant to remove the dirt would leave the bank in an unstable condition. He testified:

"Q Would a front end loader such as a Caterpillar described by Mr. Ward affect the stability of the bank if it were raking on the face of the bank?

"A Yes."

He further testified:

"The bank up above this pit is sloping up close to a forty-five degree angle, maybe a little bit flatter than that. So it—presuming it is forty-five degrees, each foot that you cut into the base of

---

whose tortious conduct is a legal cause of a harm to another is liable to the other for the entire harm."
Hills v. McGillvrey, 240 Or 476, 483, 402 P2d 722 (1965); Dunn v. First Nat. Bank of Portland, 149 Or 97, 121, 39 P2d 944 (1935); Johnson v. Hoffman et al, 132 Or 46, 55-56, 284 P 567 (1930).

that bank makes the face of the bank a foot higher, approximately. So the more dirt that is taken out the more dangerous the situation becomes because the bank—the face of the bank becomes higher in relation to the bottom."

We conclude that the court did not err in denying defendant's motion for a directed verdict.

The complaint charged defendant with negligence in leaving the gravel pit unguarded, in failing to post a watchman, in failing to fence the premises, and in failing to warn persons who might come on the premises of the dangerous condition thereof. After both parties had rested, defendant moved to strike these charges of negligence on the dual ground (1) that defendant owed no duty to guard the premises or to warn of any danger and (2) that "the premises were dangerous before and there's no showing that he [Mr. Ward] changed the condition." The trial court denied the motion to strike and defendant assigns this ruling as error.

■ This is not a case of the removal of material from a gravel pit by a self-service patron under the supervision and control of the owner. In such a case the patron might well rely on the owner to take all remedial action necessary to prevent the creation or maintenance of a dangerous condition. In this case defendant had been led to believe at the outset that the pit was owned by a Mr. Stringer. However, defendant took material from the pit intermittently from the middle of April until after Juan's death on May twenty-ninth without any word from Mr. Stringer or anyone else about defendant's use of the pit. During that period there was no indication that the owner's prerogative of control was being or would be exer-

cised by anyone. Defendant was not the only person taking gravel from the pit, but the other users, according to defendant, took material in smaller quantities and with smaller equipment. At all times while defendant was using the pit he knew that the pit face was in a dangerous condition. Under those circumstances we think that by May twenty-ninth defendant had no right to expect the owner of the pit to come in and eliminate the danger.

██ After the jury had decided, as it evidently did, that defendant had participated substantially in creating the dangerous condition, it became a jury question as to whether defendant should have taken steps to prevent the infliction of physical harm to persons coming on the land. Plaintiff's expert believed that the pit face should have been sloped and defendant testified that benching was necessary to make it safe. Defendant did not have exclusive possession or control of the pit, but at the time of Juan's death he was still exercising such control as his operations required, which we think would include the right to post warnings, erect barricades and otherwise guard the area. This court so held in *Pate v. Parker,* supra, which involved a similar factual situation. We think the jury in this case could have found, until the bank was made safe by someone, defendant should have provided such safeguards as a watchman, temporary fences or barricades and an adequate warning. In view of his nonexclusive possession and control, we doubt that defendant had any right to permanently fence out other users from land owned by a third party.

██ The defendant also assigns as error the refusal of the court to strike from the complaint the following allegation:
"* * * that said premises were left in such

a condition as to be attractive to children, which condition would and did arouse their curiosity and interest so as to invite them thereon * * *."

There was no indication that defendant's activities made the gravel pit more attractive to children than it had been before he started to take gravel therefrom. Under these circumstances the quoted allegation should have been stricken as irrelevant. We doubt, however, that defendant was prejudiced by the failure of the court to do so. The issue tried before the jury was whether or not defendant had increased the degree of risk inherent in an already dangerous pit face. Defendant was charged with "creating a dangerous and unstable bank" and defendant responded by testifying that the bank was already dangerous and unstable and that he did not increase the risk.

Defendant knew that there was a boat launching facility on the riverbank between the gravel pit and the bridge and that children came with their parents to that area and that he had seen children "in the general area." Defendant was therefore aware that children might be among those exposed to the risk of injury by the dangerous pit face. However, the court did not instruct the jury that defendant owed any special duty to children. Defendant's duty was cast in general terms applicable alike to all persons who might be exposed to the risk. Defendant did not object to those instructions. In view of all the circumstances we think the presence of this allegation in the complaint was harmless.

The defendant assigns as error the giving by the court of the following instruction on the measure of damages:

"If you decide for the plaintiff on the question

of liability, you must then determine the amount of money which will reasonably and fairly compensate the plaintiff for the reasonable expenses paid or incurred for funeral services for the decedent, and for the actual pecuniary loss, if any, to the plaintiff. Pecuniary loss is the value of those benefits measured in dollars which the plaintiff could reasonably have expected to receive from the decedent had decedent's life not been terminated.

"In determining pecuniary loss you should consider the following factors concerning the decedent:

"What the decedent customarily contributed in the past; what the decedent might reasonably have been expected to contribute in the future; what services the decedent might reasonably have been expected to perform for the plaintiff; and decedent's age, life expectancy, health, habits, industry, sobriety and thrift."

The defendant excepted to the above instruction on the ground that it failed to limit the damages to the minority of the decedent and did not instruct the jury to deduct the expenses of the care, support and maintenance of the decedent.

■ We first point out that the instruction was drafted for use in an action brought under ORS 30.020 for the wrongful death of an adult and should be modified if used in an action brought by a father under ORS 30.010 for the death of his minor child.

■ The right of a father to recover damages under ORS 30.010 for the wrongful death of a child is limited to the value of the services of the child during his minority. *Craft v. N.P.R.R. Co.*, 25 Or 275, 285, 35 P 250 (1894); *Schleiger v. Northern Terminal Co.*, 43 Or 4, 9, 72 P 324 (1903); Kester, *Procedure in Wrong-*

*ful-Death Actions,* 29 Or L Rev 31, 35. This limitation may have been implied in another part of the instructions, but we think the defendant was entitled to have the jury specifically advised that the recovery was limited to the minority of the child.

■ The instruction excepted to was also defective in failing to inform the jury that in determining the value of the child's services during his minority there should be deducted the cost of rearing the child during the same period. *Putman v. Southern Pacific Co.,* 21 Or 230, 239, 27 P 1033 (1891) (withdrawn opinion). See cases collected in Annotation, 14 ALR2d 485, Measure and elements of damages for personal injury resulting in death of infant, § 8 at 502. Since we are unable to say that the errors in the damage instruction were not prejudicial the case must be reversed for a new trial.

■ Since the case probably will be retried, we deem it advisable to consider plaintiff's contention, urged in the trial court and here, that the measure of damage should include an award for the loss by the father of the companionship and society of his child. We have concluded that we should adhere to the traditional measure of damages recoverable by a parent under ORS 30.010 and leave to the legislature the responsibility for enlarging the measure of damage if it sees fit to do so. This is particularly true since a parent in Oregon can elect whether to recover under ORS 30.010 or under 30.020 or may, indeed, elect to recover under both statutes.

The legislature has been actively concerned with the measure of damages for wrongful death in Oregon. ORS 30.010 and 30.020 were both enacted in 1862 as complementary statutes—one creating a cause of ac-

tion for wrongful death of all persons, both adult and minor—the other expanding the father's common law cause of action for loss of services resulting from injury to his minor child to include loss of services resulting from the death of the child. As originally enacted ORS 30.020 limited recovery to $5,000. In 1907 the limit was raised to $7,500,[3] in 1929 to $10,000,[4] in 1949 to $15,000,[5] in 1953 to $20,000,[6] in 1961 to $25,000.[7] In 1967[8] the ceiling of the dollar amount recoverable was eliminated entirely, but, as we point out later, recovery was limited to "actual pecuniary loss."

It would appear that when the legislature was from time to time fixing the limit on recovery under ORS 30.020 it did not also put a limit on recovery under ORS 30.010 because it knew that recovery under the latter statute was already restricted to recovery for loss of the services of the deceased child.

Until 1939 the ORS 30.020 cause of action was for the benefit of the decedent's estate only.[9] In 1939 the surviving spouse and dependents were made the primary beneficiaries of the action and if there is no surviving spouse or dependents the action is brought for the benefit of the estate. Of course, if an action is brought for the benefit of the estate of a minor decedent his parents will usually be the beneficiaries of any amount recovered.

In 1953 the legislature expanded the measure of damages recoverable under ORS 30.020 to "include

---

[3] OL 1907, ch 72.
[4] OL 1929, ch 354.
[5] OL 1949, ch 518.
[6] OL 1953, ch 600, § 1.
[7] OL 1961, ch 437, § 1.
[8] OL 1967, ch 544, § 1.
[9] OL 1939, ch 466.

a recovery for all reasonable expenses paid or incurred for funeral, burial, doctor, hospital or nursing services for the deceased."[10]

When the legislature in 1967 eliminated the ceiling on the amount recoverable it carefully restricted recovery to "the actual pecuniary loss, if any, to such spouse, dependents or estate." It is apparent from its minutes that the House Judiciary Committee, in adding the above language to ORS 30.020, intended to make clear that damages for emotional suffering were not to be recoverable.

ORS 30.010 also received legislative attention in 1961 when the cause of action given to a guardian for the injury or death of his ward was eliminated from that statute.[11]

In view of the close attention given over the years by the legislature to the measure of damages recoverable in Oregon for wrongful death under the statute applying to both adults and minors, this court should not now disrupt the legislative scheme by transforming the father's limited cause of action for loss of services during his child's minority into a cause of action permitting unlimited recovery to the father for emotional trauma suffered by him. It does not seem reasonable that the legislature would carefully restrict the recovery under the wrongful death statute, ORS 30.020, and yet permit the jury to award unlimited recovery for emotional trauma where a parent is suing to recover for the death of his child under ORS 30.010.

Reversed and remanded for a new trial.

---

[10] OL 1953, ch 600, § 1.

[11] OL 1961, ch 344, § 102.

SLOAN, J., dissenting.

It is just simply absurd to tell a jury that the loss for the wrongful death of a child is computed by speculating on his anticipated earnings during his minority, less the anticipated cost of rearing the child. This ignores the facts of life including the stringent limitations on child labor made by law. Except in rare instances, this rule will always produce a negative result and everybody knows it. Professor Prosser says that: "Such decisions [like the majority decision] do not appear very likely to command respect for the administration of justice; * * *." Prosser, Torts (3d ed) 931, § 121. It is difficult to understand how a judge could avoid blushing when he repeats this sophistry to a jury.

It is an equal fallacy to say that the legislature by its amendments to ORS 30.020 and its predecessors has fixed the measure of damages of its "complementary" statute, ORS 30.010. There is no legislative history directly related to ORS 30.010 except that when the statute was originally enacted in 1862 it was placed in Title III of the code which was limited to who could be or were necessary parties to an action. It remained in that chapter until the code revision of 1953. See 1 OCLA 307. This provides the only indication of legislative purpose relative to ORS 30.010. When ORS 30.020 was enacted in 1862 it was placed in Title VI relating to actions by or against executors and administrators. It remained in that title until the 1953 code revision. There is no legislative history that gives the slightest support to the majority's characterization of the two statutes as complementary. But even if for the sake of argument it is said that they are complementary, the active concern of the leg-

islature with ORS 30.020 and its predecessors from 1862 until 1953 has been limited to increasing the amount of allowable damages, nothing more. The legislature has been totally silent about the kind of losses that are compensable. By Oregon Laws 1953, ch 600, ORS 30.020 was amended to permit recovery for burial and medical expenses. This is the first legislative word about the character of damages. In 1967, as the majority state, the words "actual pecuniary loss" were inserted. It is obvious that those words require judicial clarification as to what kind of losses are pecuniary.. Thus, it appears certain that the legislature has never been concerned about the elements of loss and has left this entirely to the courts for determination. It is inconceivable to me that this legislative history, limited in scope and limited entirely to ORS 30.020, provides a bar to judicial determination of what evidence and instructions the jury shall consider to determine the amount of damages in an action permitted by ORS 30.010.

The majority are also well aware that it is futile to expect the legislature to correct the error the majority perpetuate. The legislature seldom responds when, as here, the problem is one for the court to solve. The cases in which the legislature has specified a rule of damages are almost non-existent.

Other courts that have, in recent years, confronted a similar statute have accepted the responsibility and abolished the rule of profit less cost. *Wycko v. Gnodtke,* 1960, 361 Mich 331, 105 NW2d 118, and *Fussner v. Andert,* 1961, 261 Minn 347, 113 NW2d 355, are the two leading cases. Both of these cases state that the loss should be measured in terms of the pecuniary loss of comfort, society and companionship.

The Minnesota decision stated that 24 states allow recovery on this basis.

The majority say that the use of words "society, comfort and companionship" are the equivalent of allowing damages for the "emotional trauma" suffered by the parent. I doubt that this is so or that the jury would have any problem in making the distinction. As a practical matter, however, it is apparent that juries do consider these unarticulated considerations. See Prosser, *supra,* for a few examples. It may be that it is unnecessary to use the actual words "society, comfort and companionship" in our instructions. The first paragraph of the instruction given by the trial court in the instant case would, no doubt, be adequate in the usual case. The vice of the majority rule is its insistence on limiting the damages to a child's earnings and then reducing that amount by the cost of rearing the child. As stated before, this confronts the jury with a choice of ignoring the court's instructions or returning a negative verdict. This, as pointed out by Prosser, is demeaning to the court and to the jury. There is no need to continue this predicament.