Argued January 9, affirmed March 21, 1974

WOOSLEY, *Respondent, v.* DUNNING, *Appellant.*

520 P2d 340

*James C. Tait,* Oregon City, argued the cause for appellant. On the briefs with him were Frederic D. Canning and Hibbard, Caldwell, Canning, Bowerman & Schultz, Oregon City.

*Raymond J. Conboy,* Portland, argued the cause for respondent. With him on the brief were Richard Noble and Pozzi, Wilson & Atchison, Portland.

TONGUE, J.

This is an action for wrongful death arising out of an automobile accident, following which the decedent died in a hospital during diagnostic tests. The case was tried before a jury, which returned a verdict for $95,000. Defendant appeals from the resulting judgment. We affirm.

Defendant's ten assignments of error include the denial of his motions for involuntary nonsuit and for a directed verdict. Because the jury found in favor of the plaintiff she is entitled to the benefit of all

favorable evidence, in the event of any conflict in the evidence, as well as all favorable inferences from the evidence. *Gordon Creek Tree Farms v. Layne et al,* 230 Or 204, 218, 358 P2d 1062, 368 P2d 737 (1962). We shall therefore review the evidence in that light.

Plaintiff's decedent had been involved in previous automobile accidents. She sustained a neck injury with accompanying headaches, as well as a numbness of one hand as a result of those accidents. According to the testimony offered on her behalf, however, her eyes were not injured or affected as the result of those accidents.

On August 6, 1970, she was a passenger in the right front seat of a car as it entered an intersection in Coos Bay at a speed of about 20 miles per hour, according to her daughter, who was the driver. Her daughter testified that defendant, "going at a pretty good speed," went through a stop sign on her right and hit the right front side of her car.

Defendant testified that he had stopped some 15 or 20 feet behind the stop sign as he was looking for an address and that upon then seeing it further down the street he proceeded into the intersection in low gear, after looking both ways. He testified that there were no obstructions to his view, but that he did not see the Woosley car until it was "bearing down on him" at a speed of about 35 miles per hour.

A police officer arrived shortly after the accident and issued a traffic citation to defendant for going through the stop sign. That citation shows, in the handwriting of the judge, that defendant pleaded guilty. Defendant testified, however, that he told the judge that he did not go through the stop sign, but

paid the fine of $10 because he did not want to come back later for trial.

The police officer testified that immediately after the accident he observed decedent hold her hand to her head and complain of discomfort on the right side of her head. For some time after the accident she complained of severe headaches and then complained that the vision in one of her eyes was becoming "fuzzy."

In April 1971 decedent was examined by Dr. John Bishop, an ophthalmologist. Dr. Bishop was not called to testify by either party. According to his report by letter in referring decedent to Dr. James C. Luce, a neurosurgeon, for diagnosis and treatment, his examination revealed "a pale right optic nerve." According to that report he also performed a "visual field" examination, which was "normal," but found "some distortion on the Amsler grid," and concluded with the statement that "we have a 44-year-old lady, with partial optic atrophy, visual loss and a previous neurological history of trauma."

Dr. Luce testified that under these circumstances there was a possibility of a brain tumor near the optic nerve or of an embolism in an artery in that area, either of which could have caused the optic atrophy and also could cause blindness or death. He also said that another possible cause was that of a head injury, even without a skull fracture.

Under these circumstances, and after some further examinations, Dr. Luce decided that the "next logical step" was to perform diagnostic tests in a hospital, including an arteriogram and a pneumoencephalogram. These tests involved injection of air into the cavities of the brain following a spinal punc-

ture, so as to make it possible to take X-rays of the brain, including the holes through which the optic nerve comes. He testified that he considered the risks of these tests to be "about the same as for a tonsillectomy, the risk of anesthesia."

These tests were then performed and disclosed no evidence of abnormality of the blood vessels. Dr. Luce then concluded that decedent had an "optic atrophy due to the head injury" and said that this is a process which comes on slowly after the injury. Unfortunately, the decedent died four hours later of a brain stem hemorrhage. Dr. Luce testified that "there was a relationship between the tests and her death."

An autopsy was then performed by Dr. Robert Buck of the hospital staff, including the taking of slides of the right and left optic nerves. Dr. Luce participated in the autopsy and testified that it revealed changes in the right optic nerve, but no evidence of tumor or abnormal blood vessels. He expressed the opinion that there was an atrophy of the right optic nerve and that this was caused by the automobile accident in August 1970, although the previous accidents may have "predisposed her or made it more likely that the last accident would produce this type of thing."

Dr. Merlin Harvey Johnson, an ophthalmologist, concurred in that opinion based upon an examination of the hospital records, including the "history" of decedent and autopsy reports, as well as the report by Dr. Bishop.

Defendant's principal witness was Dr. Wiley Leigh Campbell, also an ophthalmologist, who testified after reviewing the hospital records and autopsy reports, after listening to the testimony of Dr. Luce and Dr. Johnson, and after detailed explanations of the

problems involved, that a diagnosis of optic atrophy without further studies was "not prudent"; that, in his opinion, it was "very doubtful" whether decedent was suffering from an optic atrophy, and that if she had optic atrophy it was probably not due to trauma as the result of the automobile accident.

1. *The trial court did not err in denying defendant's pretrial discovery motion for medical records and depositions.*

 This case was tried before the effective date of amendments to ORS 44.040 by the 1973 Legislature and its adoption of ORS 44.610-44.640 (Oregon Laws 1973, ch 136). Defendant's pretrial motion demanded production of specified medical records and also that "plaintiff's physician or physicians * * * be made available for deposition * * *." That motion was denied, based upon our decision in *Nielson v. Bryson,* 257 Or 179, 477 P2d 714 (1970).

Defendant contends: (1) that the physician-patient privilege "either terminates or is waived upon the death of the patient"; (2) that the privilege is also "waived by a personal representative's filing of an action which places the decedent's medical condition at issue"; and (3) that "examinations and tests performed upon a patient following her death are not within the * * * privilege."

Defendant asks us to overrule *Nielson.* Defendant, however, concedes that "The source of the physician-patient privilege in the State of Oregon is ORS 44.040,"[1] and says, quite properly, that in *Nielson* we

---

[1] ORS 44.040, prior to its amendment in 1973, provided as follows:

"(1) There are particular relations in which it is the policy of

held that because the privilege is solely a creature of statute (and was not recognized at common law) "the specific provisions of ORS 44.040 must be changed, if at all, by the legislature rather than by the courts." This, of course, would include any change of provisions relating to waiver of the privilege.

Defendant also points out that in *Nielson,* which involved an action for personal injuries by a live plaintiff, this court rejected the contention that the physician-patient privilege is waived by the filing of an action or by the verifying of a written complaint by the patient in such an action. The reason for that holding was that ORS 44.040 provides that a physician shall not, "without the consent of his patient," be examined in a civil action and also specifically provides that "if a party to the action * * * offers himself as a witness, it is deemed a consent" to the examination of the physician. We held that because the legislature expressly provided only one method of terminating the privilege, other than by actual consent, the legislature must have intended that there be only one method of doing so. It follows that only the legislature could change that rule by providing for waiver or termination of the privilege by the filing of such an action or by verifying a complaint in such an action.

the law to encourage confidence, and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases: * * *

"(d) A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action, suit or proceeding, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient.

"(2) If a party to the action, suit or proceeding offers himself as a witness, it is deemed a consent to the examination also of a * * * physician or surgeon * * * on the same subject."

Defendant contends, in effect, that such a holding has no proper basis in an action for wrongful death, after death of the patient, and that otherwise *Nielson* should be overruled in view of current criticism of this privilege and the fact that the "trend" is toward a "waiver" of the privilege by the verifying and filing of a complaint placing the plaintiff's medical condition in issue, as proposed by the proposed Uniform Rules of Evidence, Rule 27 (4), and the proposed Model Code of Evidence, Rule 223 (3).

In view of defendant's criticism of our decision in *Nielson,* and defendant's proposal that *Nielson* should now be overruled and replaced by a new rule, such as proposed by the Uniform Rules of Evidence or the Model Code of Evidence, it becomes pertinent to consider the action taken by the Oregon legislature on this subject at its 1973 session.

At that time a committee of the Oregon State Bar proposed a bill to amend the provisions of ORS 44.040 by providing for the disclosure of certain specified medical information upon the filing of a lawsuit.[2] The legislature then enacted a bill providing that upon the filing of an action for personal injuries the physician-patient privilege is waived to the limited extent of permitting defendant to demand "a copy of all written reports of any examinations relating to injuries for which recovery is sought."[3] Depositions

---

[2] See Minutes of House Judiciary Committee for February 12 and March 13, 1973, re H.B. 2101.

[3] See Oregon Laws 1973, ch 136, § 3. That bill amends ORS 44.040 (1) (d) relating to the physician-patient privilege by providing that subsection (d) of ORS 44.040 (1) shall be subject to the following new provisions:

"SECTION 1. [ORS 44.610] In a civil action where a claim

of a physician are still not permitted, however, unless the physician "fails or refuses to make a detailed report."[4]

Significantly, however, the legislature did not otherwise change the provisions of ORS 44.040 forbidding a physician to disclose information "without the consent of his patient" or those providing that if a party "offers himself as a witness, it is deemed a consent" to the examination of his physician. Indeed, the sponsors of that bill stated that they wanted it "absolutely clear that other aspects of the doctor-patient

---

is made for injuries to the party or to a person in the custody or under the legal control of a party, the court in which the action is pending may order the person claiming to be injured to submit to a physical or mental examination by a physician employed by the moving party. The order may be made only on motion for good cause shown and upon notice to the persons to be examined and to all parties. The motion and order shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

"SECTION 2. [ORS 44.620 (1)] Upon the request of any party the party causing the examination to be made shall deliver to him a copy of a detailed written report of the examining physician setting out his finding, including results of all tests made, diagnoses and conclusions, together with like reports of all earlier examinations of the same condition.

"SECTION 3. [ORS 44.620 (2)] Upon the request of the party against whom the claim is pending the claimant shall deliver to him a copy of all written reports of any examinations relating to injuries for which recovery is sought unless the claimant shows that he is unable to comply.

"SECTION 4. [ORS 44.630] If a party fails to comply with any section of this Act or if a physician fails or refuses to make a detailed report the court may require the physician to appear for a deposition or may exclude his testimony if offered at the trial.

"SECTION 5. [ORS 44.640] This Act applies to examinations made by agreement of the parties, unless the agreement expressly provides otherwise. This Act does not preclude discovery of a report of an examining physician or the taking of a deposition of the physician in accordance with the provisions of any other statute."

[4] *Idem.*

privilege will not be changed by passage of this statute and that abolition of the doctor-patient privilege is not being proposed."[9]

Thus, after considering our decision in *Nielson,* the Oregon legislature chose to continue the prohibition against the taking of depositions of a plaintiff's physician without the consent of the plaintiff, even after the filing of a verified complaint in a lawsuit, as held in *Nielson,* except in the event that the physician failed or refused to make a detailed report. It follows that in this respect defendant asks this court to adopt a broader rule for application to the period prior to the effective date of the 1973 Act (October 5, 1973). Thus, under the rule proposed by defendant in this case a defendant would have a broader right to take depositions of physicians during that period than the legislature was willing to permit when this problem was called to its attention.

It is clear from the legislative history of the 1973 Act that the legislature intended to liberalize the termination or waiver of the privilege, rather than to limit what defendant must contend to have been a previous legislative intent that there was an unlimited right to take such depositions upon the filing of such an action. For these reasons, we decline to adopt the rule proposed by defendant for application during the period prior to the adoption of the 1973 Act insofar as such a rule would require us to hold that the trial court erred in refusing to permit defendant the right to take the depositions of plaintiff's physicians in this case.

[9] Minutes, House Judiciary Committee, February 12, 1973, p 3, re H.B. 2101, and Senate Judiciary Committee, May 2, 1973, p 5, re H.B. 2101.

We do not believe that the fact that this is an action for wrongful death, rather than an action for personal injuries, provides a basis under which we can find that the legislature intended a different result in such a case.

Defendant refers to Wigmore as the one whose "scalpel cuts deepest" in criticism of the public policy protecting privileged communications.[6] We may or may not agree with Wigmore in that respect. Yet Wigmore himself not only recognized that the public policy protecting various privileged communications is one based upon legislative statute, rather than upon common law.[7] He also recognized that the statutory privilege of communications between physician and patient is one that is not terminated by death of the patient.[8] Neither do the proposed Uniform Rules of Evidence or the proposed Model Code of Evidence, as advocated by defendant, make any such distinction.[9]

It would be anomalous for us to hold that in amending ORS 44.040 in 1973 the legislature intended to provide that in an action for personal injuries not resulting in death depositions cannot be taken by the

---

[6] McCormick on Evidence (2d ed 1972) 223, § 105, n. 85.

[7] 8 Wigmore on Evidence (McNaughton ed 1961) 818 ff, § 2380.

[8] See 8 Wigmore on Evidence, *supra* note 7, at 853, § 2387, stating that:

"The object of the privilege is to secure subjectively the patient's freedom from apprehension of disclosure. It is therefore to be preserved even after the *death* of the patient—following the analogies of the other similar privileges. (§§ 2323 and 2341 *supra*)."

[9] Proposed Uniform Rules of Evidence, Rule 27 (1) (c) expressly provides that "holder of the privilege" includes "the personal representative of a deceased patient." See also proposed Model Code of Evidence, Rule 223 (2) (c). Cf. McCormick on Evidence (2d ed 1972) 218-19, § 102.

defendant of plaintiff's physician unless he fails or refuses to prepare a written report, but that in an action in which the injuries result in death of the patient depositions can be taken of the physician even though he has prepared a written report, which defendant may now demand.

■ As we read these new provisions, in the light of their legislative history, the intent was at least in large part to protect physicians from "harassment" by the taking of their depositions unless they failed or refused to prepare written reports. That reason applies equally in personal injury and in wrongful death cases. For similar reasons, we do not believe that in the original enactment of ORS 44.040 (as in effect prior to 1973 and at the time of defendant's motion in this case), the legislature intended that physicians should not be subject to the taking of depositions in personal injury cases, as held in *Nielson v. Bryson, supra,* but intended to permit the taking of such depositions in actions for wrongful death.

It is also suggested that there is a further reason why the result should be different in this case because it is an action for wrongful death instead of an action for personal injuries. Thus, it is said that the rights of the parties to this case must be determined by ORS 44.040 as it existed prior to 1973 and that in an action for personal injuries it was then provided by ORS 44.040 that the privilege would be terminated when the plaintiff offered himself as a witness on the subject of the injuries treated by his doctor, but that in an action for wrongful death the patient would be deceased and could not testify. As a result, it is said that in an action for wrongful death there was then no statutory provisions for termination of the privilege, with the

result that a defendant could not find out from decedent's doctor facts which might have been of importance in determining the cause of death. This, it is said, is a harsh and unjust result.

We do not believe, however, that such a "harsh and unjust result" would have occurred in wrongful death cases prior to 1973 for very practical reasons. It is true that in a personal injury case there would have been a living plaintiff who waived the privilege when he took the stand to testify on the subject of the injuries treated by his doctor. In the usual action for wrongful death, however, even though the patient was dead, the personal representative of his estate had the burden to prove that his death was caused by defendant's conduct. In most cases this was not difficult, as in cases in which the decedent died during or shortly after an automobile or industrial accident. The more difficult problem in such cases was to prove that defendant's conduct was negligent.

In some cases, however, defendant might have denied that his conduct, whether negligent or not, was the cause of death and contended that other facts, whether occurring previously or subsequently, were the cause of death. But even in such cases, the plaintiff had the burden of proof and must ordinarily have called decedent's doctor in order to prove his case. When this was done, of course, the plaintiff, as decedent's personal representative, expressly consented to a termination or waiver of the privilege. See Annot., 97 ALR2d 393, 397 (1964). The fact that this did not occur until the trial itself, so as to foreclose pretrial depositions of the doctor, was no different than in a personal injury case.

■ And even if an "unfair or unjust result" might

sometimes have occurred in such a case, the same might also have been true in personal injury cases and in other cases involving other privileges which required the exclusion of otherwise relevant evidence. Again, it must be remembered that all privileges are creatures of statutes, from which it follows that the termination, as well as the creation, of a privilege is a statutory matter. While the courts may seek to avoid an "unfair and unjust result," insofar as the courts may properly interpret the terms of such a statute, the courts cannot otherwise require the termination of a statutory privilege.

This result is also in accord with the view as stated in DeWitt, Privileged Communications Between Physician and Patient 388, § 123 (1958):

"*Action for Damages for Death of Patient*

"In a few states, the statute expressly provides that when any person designated therein brings an action to recover damages on account of the death of a patient, such person thereby consents to the introduction in evidence of the testimony of any physician who attended said deceased. In the absence of such a provision, the mere bringing of such an action does not constitute a waiver of the privilege.

To the same effect, see *Jaffe v. New York,* 196 Misc 710, 94 NYS2d 60 (1949), and *Tinney v. Neilson's Flowers, Inc.,* 61 Misc 2d 717, 305 NYS2d 713 (1969).

For all of these reasons we hold that the trial court did not err in denying defendant's motion to require that plaintiff's physicians be made available for the taking of their depositions.

*The autopsy.*

Defendant's remaining contention on this appeal

with reference to his pretrial motion relates to the autopsy. Defendant contends that this pretrial motion should have been allowed, "at a minimum," as to Dr. Luce "insofar as his participation in the autopsy" and as to Dr. Buck, the hospital pathologist who apparently performed the autopsy, including the taking of "slides" of the optic nerve.

It may be, as contended by defendant, that plaintiff had the burden of proof to establish her claim of privilege[10] and that Dr. Buck, a hospital pathologist who performed the autopsy was not subject to the physician-patient privilege.[11] It does not necessarily follow, however, that Dr. Luce, a treating physician who was generally subject to the privilege, but who subsequently participated in the autopsy, could be made subject to deposition "insofar as his participation in the autopsy."

■ In any event, we need not decide that question in this case because, in the absence of a record of the hearing on the motion, it does not appear that the question whether defendant was entitled to take the deposition of Dr. Luce to that limited extent, even though not entitled to take the deposition of Dr. Luce relating to his treatment of the decedent, was ever raised in the trial court so as to be presented for decision by that court. The motion was to "requir[e] the

---

[10] See 8 Wigmore on Evidence, *supra* note 7, at 832-33, § 2381.

[11] Cases cited by defendant to that effect include: Ferguson v. Quaker City Life, 146 A2d 580 (DC Municipal App 1958); Eureka-Maryland Assur. Co. v. Gray, 121 F2d 104, 74 App DC 191 (1941). See also 8 Wigmore on Evidence, *supra* note 7, at 841, § 2382; and Annot., 58 ALR 1134 (1929).

Cases cited by plaintiff to the contrary include: Mathews v. Rex Health & Accident Ins. Co., 86 Ind App 335, 157 NE 467 (1927); Thomas v. Byron Township, 168 Mich 593, 134 NW 1021 (1912).

plaintiff's physician or physicians to be made available for deposition and to bring with them any and all records pertaining to their *diagnosis and treatment* of the plaintiff." (Emphasis added) That motion did not raise the question now urged by defendant on the appeal.

Neither did that motion raise, at least in any direct manner, the question whether plaintiff was required to produce for deposition Dr. Buck, the hospital pathologist. Dr. Buck was not named as one of the doctors whose depositions was sought. He was not one of "plaintiff's physicians" and had no records pertaining to the "diagnosis and treatment of the plaintiff."

Thus, we need also not decide that question on this appeal, although we may agree that defendant was entitled, on proper motion, to take the deposition of Dr. Buck as the doctor who performed the autopsy. For these same reasons, it is not necessary for us to decide whether defendant was prejudiced by any error in the failure of the trial court to permit him to take the deposition of Dr. Buck, who was not called as a witness by either party at the time of trial.

Defendant's motion did, however, specify various records to be produced, including a demand for production of

"* * * any and all slides of the optic nerves, including differential stains, from Dr. Robert Buck, Providence Hospital * * *."

■ The trial court clearly erred in denying defendant's pretrial motion to require plaintiff to produce such "slides," as taken in the course of the autopsy. We do not believe, however, that defendant was prejudiced as a result. Defendant was furnished with the

complete hospital records in advance of trial, including the four-page autopsy report. Defendant could have subpoenaed the slides for production at the time of trial, as well as Dr. Buck himself, but did not do so. If he had done so his expert witness, Dr. Campbell, who apparently sat through at least a substantial part of the trial, would have had time to examine them before testifying.

Moreover, Dr. Campbell, in the course of his testimony, made no mention of these slides or that he would have liked to have examined them, as he did with reference to the records of tests by Dr. Bishop, who was a treating doctor subject to the privilege. Again, Dr. Bishop was not called to testify by either party and none of his records were subpoenaed by either party. However, his letter report to Dr. Luce, in which the results of the various tests made by him were stated, was received in evidence, and without objection by defendant.

For all of these reasons and under these circumstances, we hold that the trial court did not err in denying defendant's pretrial discovery motion, except for its demand for the production of the autopsy slides of the optic nerve, and that defendant was not prejudiced as the result of the failure of the trial court to require the production of those slides in advance of trial.

2. *The trial court did not err in denying defendant's motions for nonsuit or directed verdict or in its instructions on causation.*

■ Defendant moved for an involuntary nonsuit and also for a directed verdict on the grounds that: (1) that there had been "no showing of a causal relationship

between the accident of August 6, 1970, and the exploratory surgery in June of 1971," and (2) "[t]he plaintiff's evidence established as a matter of law that the diagnostic tests were an intervening force which constituted a superseding cause of Mrs. Woosley's death."

It has been previously held by this court, as well as by other courts, that one who negligently injures another person is liable for damages not only for the original injury, but also for all additional injury caused by a physician's treatment, even if negligent, so long as the treatment was provided in good faith effort to diagnose, cure or alleviate the original injury. *McDonough v. National Hosp. Ass'n,* 134 Or 451, 460, 294 P 351 (1930); *Williams v. Dale,* 139 Or 105, 8 P2d 578 (1932); *Gilman v. Burlingham,* 188 Or 418, 216 P2d 252 (1950). See also 2 Harper and James, The Law of Torts 1124 n. 13, § 20.3 (1956); Prosser, Law of Torts (4th ed 1971) 278-79 n. 60, § 44; 2 Restatement of Torts 2d 496, § 457 (1965).

As stated in 2 Harper and James, *supra* at 1124 n. 13:

"If this were not so, the situation would be intolerable unless the two actions [i.e., for the original injury and a physician's subsequent malpractice] were joined or tried together. The first defendant could escape liability for the aggravation by showing the doctor's negligence to one jury, leaving plaintiff with only a malpractice case—one of the trickiest and most difficult to maintain in the field of accident law."

After examination of the medical testimony in this case we are convinced that plaintiff offered sufficient evidence to make the question of causation a jury question, depending upon whether the jury decided to

believe the testimony of Dr. Luce and Dr. Johnson, who testified for the plaintiff, or that of Dr. Campbell, who testified for the defendant. Plaintiff offered evidence from which the jury was entitled to find that decedent suffered from an atrophy of the optic nerve that was caused by this accident; that the diagnostic tests were done for the purpose of determining whether the atrophy may have been caused by a tumor, an aneurism or some other cause, and that defendant's symptoms were such as to give rise to the need for these tests.

Based upon that same review of the record we also reject defendant's contention that the evidence established that the diagnostic tests constituted an intervening and superseding cause as a matter of law. First of all, it may be contended that the rule of the *McDonough* case is a rule based upon reasons of public policy and one that forecloses the possible defenses of intervening or superseding cause by subsequent medical treatment, whether negligent or not. In any event, and assuming that such defenses are available in such a case, the jury could properly find from the evidence in this case that the automobile accident was the cause of an atrophy of decedent's optic nerve; that although these subsequent diagnostic tests may have been an immediate cause in fact of decedent's death, they nevertheless constituted no more than a concurring cause which together with the optic atrophy resulting from the automobile accident of August 6, 1970, concurred in causing decedent's death and that the automobile accident was at least a "substantial factor" in causing her death. Cf. *Babler Bros. v. Pac. Intermountain,* 244 Or 459, 464-65, 415 P2d 735 (1966); *Hills v. McGillvrey,* 240 Or 476, 483,

402 P2d 722 (1965); *Escobedo v. Ward,* 255 Or 85, 91, 464 P2d 698 (1970).

■ Defendant also assigns as error the giving of the following instruction on the question of causation:

"If you find that the defendant was negligent, and that the decedent Dorothy Woosley suffered injury as a result thereof, then the defendant is liable for any additional injuries including death caused by physicians who rendered services for Dorothy Woosley in a good faith effort to diagnose, cure or alleviate her injury. One whose negligent conduct causes injury to another is liable for damages not only for the original injury, but for all additional injury, including death, caused by a physician's treatment even if you find medical treatment was negligent, so long as treatment was provided in a good faith effort to diagnose, cure or alleviate the original injury, and so long as the medical treatment was reasonably sought by the patient."

The first exception taken to that instruction was that it "attributed the end result of the defendant's negligence, if any, to include *any wrongful acts* which were subsequently done by a physician," whereas "Several courts have found nonliability in cases of *extraordinary malpractice.*" (Emphasis added) However, even defendant's expert witness, while disagreeing with the diagnosis and diagnostic tests and treatment by plaintiff's doctors, did not testify that this was a case of "extraordinary malpractice."

The remaining exception to that instruction was that it permitted the jury to award damages for mental suffering, which at that time were not recoverable under ORS 30.020.[22] Any such doubt, however, was clarified by further instructions which clearly told the

[22] But see Oregon Laws 1973, ch 718, effective January 1, 1974.

jury that any damages awarded must be confined to pecuniary loss.

■ In addition, defendant assigns as error the failure of the trial court to give instructions requested by defendant on the subjects of intervening force and superseding cause in the language of 2 Restatement of Torts 2d 465-469, §§ 440-442 (1965). Defendant recognizes that some of these requested instructions "* * * may run afoul of the court's holding in *McDonough v. National Hosp. Ass'n,* 134 Or 451, 460, 294 P. 351 (1930)," but contends that there was "a reasonable difference of opinion" as to the foreseeability of defendant's negligence "causing an automobile accident and the consequent death of Mrs. Woosley after diagnostic tests," and that "[U]nder the somewhat peculiar facts of this case * * * the issue of superseding cause * * * should have been submitted to the jury." Defendant also contends that there was a fact question whether decedent had optic atrophy and, if so, "* * * whether or not one of the many other causes of optic atrophy which were unrelated to the Dunning accident led to the diagnostic tests and Mrs. Woosley's eventual death."

The instructions by the trial court were based upon the rule as stated by this court in *McDonough v. National Hosp. Ass'n, supra.* They were also consistent with our subsequent decision in *Babler Bros. v. Pac. Intermountain, supra.* In that case we discussed (at 244 Or 464) a previous decision in *Oregon Mutual Ins. Co. v. Mayer,* 211 Or 556, 316 P2d 805 (1957), in which we had held that plaintiff's negligence had been superseded by defendant's negligence under the facts of that case. We then said (at p 464):

"We believe, upon further analysis, that *Oregon*

*Mutual Ins. Co. v. Mayer* should be overruled. The holding seems inconsistent with our more recent decisions which have held that ordinarily it is for the trier of fact to say whether (a) the conduct complained of was a substantial cause of the harm, and (b) whether the conduct in question was negligent. \* \* \*"

See also Prosser, *supra,* 270, 276-280, § 44.

As previously stated, we do not decide in this case whether the defense of intervening or superseding cause was available to defendant under the facts of this case. Assuming, however, that defendant was entitled to proper instruction on intervening or superseding cause, we do not believe that the court erred in failing to give the instructions requested by the defendant. The requested instructions were in the abstract language of the Restatement of Torts and in terms not easily understood by ordinary jurors, even though they may have correctly defined "superseding cause" and "intervening force" and the "considerations important in determining whether an intervening force is a superseding cause," in the language of the Restatement of Torts.

The requested instructions were also incomplete as applied to the facts of this case, in that they would not have informed the jury of the important qualification, as stated in 2 Restatement, *supra,* § 442A, that "where the negligent conduct of the actor [defendant] creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing this harm, such intervention is not a superseding cause," among other qualifications to the rule of superseding cause. See also Prosser, *supra,* 276-280, § 44.

For all of these reasons, and under the facts of

this case, we hold that the trial court did not err in failing to submit defendant's requested instructions on intervening force and superseding cause.

3. *The trial court did not err in its instructions on negligence per se and right of way.*

Defendant's remaining assignments are that the trial court erred in instructing the jury that violation of a statute is negligence "in and of itself" and in failing to give defendant's requested instruction that strict compliance with a statute may under some circumstances be excused, as well as a "right of way qualification" instruction. In support of these assignments defendant relies primarily on our decisions in *Barnum v. Williams,* 264 Or 71, 504 P2d 122 (1972).

■ This is not a case such as *Barnum,* in which defendant admitted violation of a statute, but contended that in doing so he acted reasonably under the circumstances and should therefore be excused for doing so. In this case, on the contrary, defendant did not admit the violation of a statute or ask to be excused for doing so. Instead, he denied violation of the statute.

In *Barnum* we said (at 96 Adv Sh 95) :

"Another way of stating this is that the violation of a motor vehicle statute creates a presumption of negligence. When the evidence establishes that a party has violated a motor vehicle statute, such a party has the burden of producing evidence that, nevertheless, he was acting reasonably. Without such evidence, the party is negligent as a matter of law. Raz v. Miller [sic], 231 Or 220, 226-227, 372 P2d 955 (1962).

"If the party having such burden produces no evidence of reasonable conduct or the court finds the evidence produced is insufficient to prove rea-

sonable conduct, the court must find the party negligent as a matter of law. If the party produces evidence which the court determines raises a question of fact whether the party acted reasonably, despite violation of the statute, then, the question of the party's negligence is for the jury."

It follows that the trial court did not err in instructing the jury that violation of the statute was negligence "in and of itself" and in refusing to give defendant's requested instruction that violation of a statute may be excused under some circumstances.

■ As for the failure to give defendant's requested "right of way qualification" instruction, we have examined the instructions given by the trial court on the question of right of way and hold that they were fair and adequate and that under the facts of this case the trial court did not err in refusing to give that requested instruction. Cf. *Stahl v. Tobiasson*, 257 Or 445, 479 P2d 751 (1971).

Finding no error, we affirm the judgment of the trial court.