Argued June 4, reversed and remanded July 6, motion to
withdraw petition for rehearing allowed November 27, 1973

BIRKES, *Appellant, v.* WADE, *Respondent.*

511 P2d 831

*Robert C. Robertson,* Medford, argued the cause for appellant. With him on the brief were Van Dyke, DuBay, Robertson & Paulson, P.C., Medford.

*Allan B. deSchweinitz,* Medford, argued the cause for respondent. With him on the brief were Haviland, deSchweinitz and Stark, Medford.

TONGUE, J.

This is an action for damages for personal injuries sustained by plaintiff in a fall at defendant's motel. The jury returned a verdict in favor of plaintiff for $46,975 in general damages and $28,770.85 in special damages. Defendant then filed a motion for entry of a judgment n.o.v., or, in the alternative, for a new trial, based upon various alleged errors. The trial court entered an order setting aside the jury verdict and granting a new trial. Plaintiff appeals from that order.

In granting a new trial the trial judge rejected all of defendant's claims of error except for the contention that the court erred in not granting defendant's motion to withdraw from the complaint the allegation

that the various injuries sustained by plaintiff as a result of that fall included:

"Traumatic aggravation of preexisting latent conditions of Muscular Dystrophy causing it to become symptomatic."

The basis for this holding by the trial court, as stated in the order as entered by it, is as follows:

"* * * The only evidence in support of this allegation was the testimony of Dr. Luce. The Court has reexamined the testimony of Dr. Luce and feels that his opinion in support of that allegation was based upon incomplete history. It is pointed out by the cross examination by defendant's counsel, had he known of the history given Dr. Boe that the plaintiff had in fact not had polio, which was testified to by his mother, and had he known of the other falls which the evidence disclosed, that his opinion would have been different. * * *"

## 1. *Summary of testimony re Muscular Dystrophy*

A lengthy review of the testimony in this six-day trial would serve no useful purpose, except for testimony relating to this single issue. In reviewing the record for this purpose it must be remembered that plaintiff is entitled to the benefit of all favorable evidence and to all favorable inferences from that evidence. Accordingly, we do not undertake to mention all of the unfavorable testimony in this record.

### a. *Testimony of plaintiff and his wife.*

On the night of December 30, 1964, plaintiff, a truck driver on a trip to California, stopped his truck at defendant's motel, where he slipped and fell, striking his lower back, elbows and hands and knocking himself unconscious, according to his testimony. Plaintiff testified that prior to the accident he had been in

good health and had engaged in horseback riding, golf, fishing and hunting, as well as in his work as a truck driver, and that:

"[t]o my knowledge I had no problems with my muscles."

He also testified that he had not noticed that any of his muscles had been growing smaller year by year and that:

"* * * my left bicep has always been slightly smaller than my right bicep. As far as that portion of my anatomy, I'm right-handed. I never failed to do any type of work with my arms. And it didn't bother me at all. And I didn't, by reason of being right-handed, it being slightly smaller I thought was just something natural."

but that since the accident:

"* * * My entire muscle system has diminished along with my weight entirely."

Plaintiff also testified that in July 1963, prior to the accident, he consulted Dr. Boe because of a kidney infection, but that "other than this urinary problem" he had no problems "of a physical nature" between July 1963, and December 30, 1964.

Plaintiff further testified that shortly after his fall on that date he went to a hospital in Ashland, but that no doctor was on duty there at that time; that after a nurse gave him some pain pills he completed his trip to California and his return trip to Oregon with his truck. He then consulted Dr. Hansen, his family physician, who referred him to Dr. Cohen, an orthopedic surgeon, who first examined plaintiff on March 6, 1965.

Plaintiff was able to continue his work of truck driving until sometime in 1967, although testifying that because he had a wife and child to support he "was

obliged to work," but did so "against doctor's orders" and with medication for pain. Beginning seven or eight months after his fall at defendant's motel, according to plaintiff's wife, plaintiff started to occasionally fall on his knees. In August 1966, he also fell from the top of a truck, landing on his left side. In April 1972, he was knocked down by his wife's car when she forgot to set the parking brake, causing an abrasion on one knee and a bruise on one foot. For some time prior to trial plaintiff was unable to get around without crutches, according to what he told his doctor.

b. *Testimony of Dr. Boe.*

Dr. Boe testified that when he was consulted by plaintiff in July 1963, plaintiff "wanted a complete physical" and complained of "morning discharge, and a feeling of weakness and lifelessness for the past six months." Among "other complaints" by plaintiff, according to Dr. Boe, was that "his legs were numb if he crossed them and left them crossed too long; his fingers became numb." He also complained of sharp pains in the small of his back and pelvis. Upon giving plaintiff such an examination he found, among other things, that "the left upper arm was atrophied, there was very little muscle left in that area of the left upper arm," but that he noticed no atrophy of any of the other muscles of the arms or legs.

After completing his examination Dr. Boe found plaintiff was in "good health except for some irritation of the bladder outlet." Dr. Boe was of the opinion that numbness in the legs after crossing them for some time is "a normal condition" for persons of plaintiff's size and weight; that the pains in plaintiff's back and pelvis were associated with his urinary complaints and that

"his fatigue, tiredness, was of a neurotic type" and that "he was having some problems at that time."

Dr. Boe did not see plaintiff again until his deposition was taken at which time Dr. Boe was "quite shocked by his appearance. He was using arm crutches, he has lost weight, there appeared to be a generalized muscular weakness" and that, among other things, "[h]is legs are extremely thin, especially on the left. The muscles are about maybe 20 per cent present, 80 per cent wasted away." Dr. Boe did not venture to express an opinion whether plaintiff's injury on December 30, 1964, was the cause of that condition.

### c. *Testimony of Dr. Cohen.*

Dr. Cohen testified that when plaintiff first came to him in March 1965, he said that he had no prior trouble and had been in good health. Dr. Cohen said that he had no reason to disbelieve those statements. Dr. Cohen also testified that plaintiff complained of pain in his shoulders and back at the time of this examination and of numbness in his right arm and hand. Upon examining plaintiff he found some atrophy of the muscles and some numbness, when tested. At that time, however, Dr. Cohen "didn't really consider * * * that his injuries were particularly serious."

During 1965 and 1966 Dr. Cohen saw plaintiff on 13 or 14 separate occasions. He testified that "as the examination progressed my opinion also was that this problem ["a pre-existing atrophy of the arms"] was not polio, but was a form of muscular dystrophy."

Dr. Cohen also testified as follows:

"Q Doctor, what effect did these injuries have that you've just indicated with relation to this acci-

dent—what effects did they have on this condition of muscular dystrophy which you diagnosed?

"A Well, I first want to say that the injury didn't cause the muscular dystrophy. I think this condition existed long before. I think that the muscular dystrophy was slowly producing weakness, but it was occurring so slowly over the years that he probably didn't feel this. Things that happen very slowly we often don't feel, but nevertheless, it is present. I think that *with an injury of any pre-existing condition that there is weakness involved in it, you aggravate this weakness and disturb the balance, and once you disturb the balance of muscular pull you disturb the overall gait and numbers of other things involved, so this doesn't have to have anything to do with a disease, producing a disease or developing a disease.*

"It has something to do with *the physiology and the anatomy and the effects of forces.*

"Q Dr. Cohen, do you *have an opinion as to whether or not what you've just testified to occurred in Mr. Birkes based upon reasonable medical probability?*

"A *Yes, I think that's what has happened.*

"Q Dr. Cohen, could it change your opinion in these areas you've just testified to in the event that you knew that Mr. Birkes had seen a Dr. Boe in July of 1963, which is approximately a year and a half prior to this accident, and complained to Dr. Boe of having fatigue and having sharp pains in the pelvic region and low back when he urinated?

"A No, I don't think that would—no, that could be the result of other things. It could be a urinary disturbance." (Emphasis added)

Dr. Cohen's testimony was not limited to the aggravation of muscular dystrophy by this fall on his back. He also expressed the opinion that the fall also

had other results as alleged in plaintiff's complaint. Thus, he also expressed the opinion that the fall aggravated a pre-existing degenerative disc disorder in plaintiff's cervical spine and also caused a strain and sprain of the muscles, ligaments and soft tissues of the cervical and lumbar areas of his spine and that, in his opinion, plaintiff was permanently and totally disabled.

Defendant does not now contend that on cross-examination Dr. Cohen was asked any questions going directly to his opinion relating to the effect of plaintiff's fall at defendant's motel upon his pre-existing muscular dystrophy. Dr. Cohen was, however, asked the following questions relating to the fact that beginning about eight months after that accident (according to plaintiff's wife) plaintiff began to fall to his knees and that in August 1966, he fell from a truck and landed on his side, according to plaintiff's testimony:

"Q Isn't it a fact, Doctor, that as the condition of muscular dystrophy progresses that the trauma of falling to the knees becomes more serious to the areas of the spine because of the lack of protection of muscles?

"A I think so.

"Q So that the falling to the knees—for example, he fell from the load, whatever he had, and that was of more significance as time went on because the muscles weren't there to protect him, is that correct?

"A We're talking about which fall, now, sir?

"Q The fall incident from the load. Well, according to the report here, he fell ten feet.

"A Is that when he struck his cheek and his arm hit his chest?

"Q He said it hit the rib case and he fell on his left hip.

"A I would have to know more about the direction of fall to be able to answer that accurately.

"Q Now, supposing he fell backward and landed on his hip.

"A I would say that it's more likely that he would hurt his back in that circumstance."

Dr. Cohen conceded that such falls were "important" and could "cause aggravation to the same area." He also agreed with defendant that "basically your diagnosis in this particular case depends upon the accuracy of what Mr. Birkes has told you"; that plaintiff had not told him about some of his falls subsequent to this accident, and that these, and other facts could be "important" and result in a "different" evaluation. He was not asked, however, in what respect, if at all, any of these things would cause him to change his opinion relating to the effect of this fall upon plaintiff's pre-existing muscular dystrophy (as distinguished from his opinion relating to other injuries resulting from the accident), much less whether any of these things would cause him to change or withdraw his opinion on that subject.

Dr. Cohen also testified that the pre-existed numbness of plaintiff's fingers (of which he apparently had also not been told by plaintiff) was probably related to a pre-existing degenerative disc disease, the aggravation of which was the basis of a separate allegation in plaintiff's complaint. He was also asked about the accident on April 20, 1972, when he was knocked down by plaintiff's wife's car and testified that it "didn't have anything to do with this matter * * *"

#### d. *Testimony of Dr. Luce.*

Plaintiff's other expert witness on the subject was Dr. James Luce, a neurological surgeon. He examined plaintiff to provide information for plaintiff's attorney on September 17, 1971, and on May 23, 1972, and also participated in plaintiff's treatment. Based upon those examinations and upon the "history" of the case as given to him by plaintiff, he testified that, in his opinion this accident caused "a traumatic aggravation of a pre-existing latent condition of muscular dystrophy, causing it to become symptomatic." He also expressed the opinion that the accident was the cause of other injuries alleged in plaintiff's complaint.

The principal thrust of defendant's cross-examination of Dr. Luce was to ask whether if it were true that plaintiff had "numerous falls to his knees * * * continuously from the week following the accident as many as ten times a week" he would not be able to "even speculate" as to the effect of the fall in December 1964, and whether "if there had been numerous falls since the time of the alleged incident here ["in the week following, and from then up to the present time"] there would be no way you could determine what caused what." Dr. Luce agreed, based on that hypothesis. However, plaintiff gave no such testimony and his wife testified that these falls did not begin until seven or eight months after the accident.

Dr. Luce also testified on cross-examination that upon examining plaintiff "there was some discussion that he had polio as a child," but he was not asked whether his opinion would have been "different" depending upon that fact.

Dr. Luce was also asked on cross-examination about plaintiff's various symptoms at the time of his

examination by Dr. Boe in 1963, prior to the accident. At that time Dr. Boe found an infection in plaintiff's bladder. Plaintiff's symptoms at that time included sharp pains in the small of his back, numbness in his legs and feelings of weakness and lifelessness. At that time Dr. Boe also observed atrophy in plaintiff's left upper arm.

Dr. Luce conceded that these symptoms were "compatible" with the conclusion that plaintiff's muscular dystrophy was "symptomatic" at that time, prior to the accident, with the result that if these symptoms then existed the accident did not cause plaintiff's muscular dystrophy to become "symptomatic" and that his testimony on direct examination would have been "different" if these various symptoms had existed previously.

In explaining his answer, however, Dr. Luce said that "you have emphasized repeatedly that you are pinpointing the cause. I said aggravation * * *" and that "I felt that the condition was pre-existent and that the fall aggravated it * * *."

Dr. Luce also testified that he asked plaintiff "about those things" and that plaintiff answered "in the negative, he had no problems." As previously noted, both plaintiff and his wife testified that he had "no problems" prior to the accident, other than the urinary problem treated in July 1963, by Dr. Boe. Dr. Luce also testified on redirect examination that the symptoms reported by Dr. Boe were not inconsistent with his earlier testimony on direct examination and were consistent with Dr. Boe's original diagnosis.

In addition, Dr. Luce testified that it was probable, "considering all of those things to be true that

were related to you by the patient," that even though he had muscular dystrophy prior to December 30, 1964, he was not aware of it.

### e. *Testimony of defendant's doctors.*

Doctors called as witnesses by defendant testified to the effect that muscular dystrophy is a disease characterized by a progressive "wasting away" of the muscles and that trauma does not change the course of the disease or make it "symptomatic."

### 2. *There was substantial evidence to support the jury verdict.*

The question to be decided by this court is not whether trauma can, and, in this case, did "aggravate" a pre-existing condition of muscular dystrophy so as to cause it to become "symptomatic." Instead, the sole question is whether there was substantial evidence to that effect, if believed by the jury.

Defendant cites cases in support of the proposition that the causal connection between an accident and an injury must be established with reasonable probability or certainty, rather than "mere possibility," and must not be "left to surmise or conjecture," quoting from *Sims v. Dixon,* 224 Or 45, 48-49, 355 P2d 478 (1960), among other cases. Defendant also cites cases in support of the proposition that while as a general rule, when the testimony of a witness on cross-examination conflicts with his testimony on direct examination the probative value of his testimony is for the jury, that rule does not apply where the witness's former testimony is "corrected or explained" on cross-examination, quoting from *O'Lander v. Int. Harvester Co.,* 260 Or 383, 388, 490 P2d 1002 (1971).

See also *Washburn v. Simmons,* 213 Or 418, 420-21, 323 P2d 946, 325 P2d 255 (1958), in which a medical witness who testified on direct examination that an accident aggravated a pelvic condition, requiring removal of the uterus, conceded on cross-examination that he was unable to say except in terms of *possibility* that the accident was in any way related to plaintiff's pelvic condition. To the same effect, see *Howerton v. Pfaff,* 246 Or 341, 346, 425 P2d 533 (1967).

■ Upon application of these tests to the testimony of Dr. Cohen and Dr. Luce we conclude that the trial court erred in holding that the testimony of Dr. Luce was the "only evidence" in support of plaintiff's allegation of "[t]raumatic aggravation of pre-existing latent conditions of Muscular Dystrophy, causing it to become symptomatic." On the contrary, we believe that the jury could properly find that the testimony by Dr. Cohen, as previously quoted, was not limited to an admission that this accident did not "cause" the muscular dystrophy, as defendant seems to contend, but that his testimony included the opinion, as a matter of medical probability, that this accident aggravated what had previously been a latent condition and caused it to become symptomatic by "disturb[ing] the balance of muscular pull."

■ We also conclude, upon the application of these same tests, that the trial court erred in holding, in effect, that the jury was required, as a matter of law, to completely disregard the testimony of Dr. Luce because the trial court "has reexamined the testimony of Dr. Luce and feels that his opinion in support of that allegation was based upon incomplete history."

Aside from whether, by reason of Article VII, § 3, of the Oregon Constitution, the trial court could

properly "re-examine" that testimony, the sole ground given by the trial court in support of that conclusion was that Dr. Luce admitted on cross-examination that his opinion would have been "different" if he had known (1) "that plaintiff had in fact not had polio," and (2) "had he known of the other falls which the evidence disclosed."

Upon reading the testimony of Dr. Luce on cross-examination we find no statement that his opinion on this subject would have been "different" had he known that plaintiff had not had polio. It is true that he said that his opinion would have been "different" if plaintiff sustained the previous falls which defendant's counsel assumed to have existed for the purpose of his questions. Those questions, however, assumed that these falls commenced the week after the accident. Plaintiff's wife, however, testified that it was not until seven or eight months after the accident that plaintiff began to have these falls. Dr. Cohen testified that these falls were caused by a weakening of the muscles of plaintiff's legs as his muscular dystrophy progressed. In addition, Dr. Luce also subsequently re-affirmed, in effect, his previous opinion that although plaintiff's muscular dystrophy was not "caused" by the accident, it was "aggravated" by it.

Accordingly, we hold that the trial court erred in concluding that the absence of polio and the existence of "other falls" destroyed all substantial probative value of the testimony of Dr. Luce on this issue. More specifically, we hold that by reference to these facts on cross-examination he did not "correct or explain" the opinion as expressed in his direct testimony so as to destroy the probative value of that testimony.

On the contrary, we believe that the jury could have properly found that it was not until seven or eight months after the accident that plaintiff began to fall on his knees and that this tended to support, rather than disprove, the conclusion that the accident aggravated plaintiff's pre-existing muscular dystrophy.

Significantly, the opinion of the trial judge makes no reference to plaintiff's various symptoms prior to the accident, as reported by Dr. Boe at the time of his examination of plaintiff for a urinary infection in 1963, perhaps because plaintiff and his wife denied any previous "problems" and perhaps because the jury could also have properly found from the testimony of Dr. Boe, Dr. Cohen and Dr. Luce that these symptoms were otherwise explainable. Cf. *Chance v. Alexander,* 255 Or 136, 138-40, 465 P2d 226 (1970).

■ It is obvious, of course, that for a medical expert witness to admit on cross-examination that the opinion expressed by him on direct examination would have been "different" had he known of the existence of some alleged fact does not destroy the probative value of his previous opinion when there is any substantial conflict in the testimony as to the existence of that alleged fact. Cf. *Wallender v. Michas,* 256 Or 587, 594, 475 P2d 72 (1970).

■ For all of these reasons, we hold that the trial judge erred in the entry of an order granting a new trial upon the ground that there was no evidence to support plaintiff's allegation that the accident caused a "[t]raumatic aggravation of preexisting latent conditions of Muscular Dystrophy, causing it to become symptomatic."

We have also examined the remaining grounds

as stated in defendant's motion for a new trial and agree with the decision of the trial judge to the effect that none of them was sufficient to require the granting of a new trial.

We therefore reverse the order granting defendant's motion for a new trial and remand this case to the trial court to reinstate the verdict of the jury and to enter a judgment in favor of plaintiff and against the defendant in accordance with that verdict by the jury.

Reversed and remanded.