HANSEN, *Respondent,*

*v.*

BUSSMAN, *Appellant.*

549 P2d 1265

*Garr M. King,* of Kennedy & King, Portland, argued the cause for appellant. With him on the brief were Allen Reel and Kennedy & King, Portland.

*Raymond J. Conboy,* Portland, argued the cause for respondent. With him on the brief were Richard P. Noble and Pozzi, Wilson & Atchison, Portland.

TONGUE, J.

## TONGUE, J.

This is an action for damages for medical malpractice for failure to diagnose and treat a congenital condition known as hypothyroidism in a 10-month-old baby, with the result that her mental development was retarded. The case was tried before a jury, which returned a verdict of $500,000 against defendant Bussman, who appeals from the resulting judgment. The jury also returned a verdict in favor of another doctor, who had been joined as a defendant, and a nonsuit was granted to a third defendant.

■ Because of direct conflicts in the testimony it must be kept in mind that after a jury verdict in favor of the plaintiff, this court is required to resolve all conflicts in the testimony in favor of the plaintiff and that plaintiff is entitled to the benefit on this appeal of all evidence favorable to her and of all inferences which may be reasonably drawn from such evidence. *Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966). The testimony will thus be summarized in accordance with this established rule.

*Summary of the evidence.*

*The congenital condition of hypothyroidism.*

Shannon Hansen was born on December 5, 1968, in St. Helens. The birth was uneventful and no abnormalities were noted by Dr. Meuhleck, her family physician, who delivered the baby and saw her again for a "six-week check-up."

In fact, plaintiff was born with a congenital condition known as hypothyroidism—a rare disease in which the thyroid gland is either not present or does not function properly. The resulting deficiency of thyroid hormone prevents normal physical and mental development. If a child does not receive adequate thyroid hormone irreversible brain damage will result. As a result, early diagnosis and treatment is essential.

According to the testimony, however, if treatment is commenced within three months there may be "min-

[ 759 ]

imal" or no mental retardation. There was also testimony that if such treatment had been commenced at three months "the odds are probably seven out of eight that she would have had an IQ of about 85 or 90" (within the normal range); that if such treatment had been commenced "between six and twelve or six and four(teen) months, there is a 65% or 70% chance that her IQ would have been above 75," but that "if she had been treated beyond 14 or 15 months, she is almost surely going to have some reduced IQ, probably below 70." There was testimony that a person with an IQ of 75 or more can work and be self-sustaining. One of the anomalies of the disease is that resulting physical retardation is reversible at a much later time, as compared with mental retardation.

Diagnosis of congenital hypothyroidism is generally made when typical symptoms manifest themselves. It appears that plaintiff never had the most common symptoms, but did have anemia and retarded physical and mental growth and that these are among the symptoms of the disease. Plaintiff offered expert testimony, however, to the effect that physicians who specialize in the care of babies use "growth charts"; that the use of such charts would have indicated that plaintiff was not growing properly in weight and length; that upon confirming a "growth deficiency," such a physician is under obligation to undertake an investigation for the cause of the deficiency, including tests which, if made, would disclose a thyroid deficiency.

*Examination, diagnosis and treatment by Dr. Bussman and other doctors.*

Dr. Meuhleck, the family doctor, did not examine plaintiff again after he made a "six-week check-up." When plaintiff was between five and eight months old, however, her parents became concerned that she was not developing properly and "seemed awfully slow * * * in growing." She "seemed listless, * * * wasn't trying to sit up," and could not roll over, among other

things, and was "a real pale baby, whitish looking." Plaintiff's grandmother then called for an appointment with Dr. Bussman, a recognized specialist in pediatrics in Portland. She testified that upon calling his nurse she was asked "what was wrong and I told her that I would like a complete examination; that the child was not progressing like she should."

On September 30, 1969, when nine months and 25 days of age, plaintiff was examined by Dr. Bussman, after being weighed and measured by his nurse. Understandably, Dr. Bussman could not recall that particular examination. Plaintiff's mother testified, however, that she told both the nurse and Dr. Bussman that she wanted a "complete physical" for her baby because of her concern over its lack of growth. This is consistent with a notation "Gen. Ck." on the "chart" made up for plaintiff, meaning a complete physical examination. Dr. Bussman testified that in conducting such an examination he would ask the parents questions designed to "amplify on that particular complaint initially" and also to elicit whether the child was meeting normal "developmental landmarks" for growth in weight and length.

Dr. Bussman testified that "* * * she was developing at or near normal landmarks and the growth and length that I observed I attributed to the family growth pattern." (Plaintiff's mother was a small person.) He diagnosed "iron deficiency anemia," prescribed "oral iron," and told plaintiff's mother that "the hemoglobin should be checked again in six weeks."

According to the grandmother:
"I * * * asked him if being anemic would cause her to be slow in growth, affect her growth, or her mental. He said it would affect her growth, but not mentally.

"So then I asked him, 'What about her mental'—I didn't get to finish. Dr. Bussman walked out and he never returned so I could finish my question."

[ 761 ]

On the next visit, the hemoglobin count had risen "only a very slight amount," from 8.8 to 9.1 grams. On a third visit it had fallen to 8.6. Assuming that the baby was not "absorbing iron adequately," Dr. Bussman then had three "iron injections" given to her by a nurse on subsequent visits.

On the sixth and last visit to Dr. Bussman plaintiff's hemoglobin level had risen to 9.9 grams. Plaintiff's mother testified that he then told them that her blood "hadn't come quite up to normal yet, but I should keep doing as I was before [in feeding the baby] and it would be back up to normal; not to worry about it. And this is all that was said." She also testified that he did not suggest further iron shots or indicate that plaintiff was in need of further examinations or tests.

Plaintiff did not improve, however, but lost her "color" and her listlessness returned. Her parents then became discouraged with Dr. Bussman. In May 1970 they took plaintiff to Dr. J. R. Stober, a chiropractor, who recognized symptoms of "glandular obstruction," thought by him to involve the pituitary gland, and attempted treatment by inflating balloon-like devices inside plaintiff's nose. That treatment was also unsuccessful.

Eventually plaintiff was admitted to the Crippled Children's Division of the University of Oregon Medical School, where her condition was correctly diagnosed and treatment undertaken. As a result, her normal physical development was restored, except for a dislocated hip. It was then too late, however, to restore her mental development. As a result, plaintiff will never develop beyond an IQ of from 41 to 50, her mental age will never exceed that of a six or seven-year-old child, and she will never be able to live independently.

1. *It was not error to submit to the jury plaintiff's allegation that her hip dislocation was caused or worsened by Dr. Bussman's failure to diagnose and treat the hypothyroidism.*

Defendant first contends that it was error to submit to the jury plaintiff's allegation that her hip dislocation was caused or worsened by defendant's failure to diagnose and treat the hypothyroidism.

Defendant relies upon the rule that the trial court is required to withdraw from the jury any allegation not supported by some competent evidence. It is equally fundamental, however, that in determining whether to withdraw an allegation from consideration by the jury it is not the function of the court to weigh conflicting evidence and if an allegation is supported by any substantial evidence, including the testimony of a single witness, it is the exclusive function of the jury to decide whether or not to believe that testimony, despite the fact that all other witnesses may have testified to the contrary.[1]

Defendant contends that the only evidence that plaintiff's hip dislocation was in any way caused or worsened by his failure to diagnose the hypothyroidism was the testimony given by him on deposition prior to trial and read to the jury at the trial. Defendant says that such testimony was not competent evidence so as to require the submission of that allegation to the jury because it ceased to have any probative value whatever "[i]n light of Dr. Bussman's full and complete explanation at trial for the change in his statements [on deposition] on [that] question * * *." In support of this contention defendant relies upon the following statement by this court in *O'Lander v. Int. Harvester Co.*, 260 Or 383, 388, 490 P2d 1002 (1971):

> "Plaintiff relies on the general rule that when a witness's testimony on cross-examination conflicts with his testimony on direct examination, the probative value of the testimony is for the jury. 58 Am Jur 491, 492, Witnesses, §863. However, the rule does not apply where the witness's former testimony is corrected or explained on cross-examination."

---

[1] See ORS 41.260; *Carlson v. Portland Ry., L. & P. Co.*, 121 Or 519, 525, 254 P 809 (1927); *Dickinson v. Fletcher,* 181 Or 316, 325, 182 P2d 371 (1947).

In response, plaintiff contends that: (a) Even if the testimony by Dr. Bussman on deposition is considered on the same basis as the opinion of an ordinary expert witness would be considered, his testimony on trial did not constitute such a "correction or explanation" of his prior testimony on deposition so as to destroy all probative value of that testimony, with the result that his testimony on deposition continued to have sufficient probative value to support and require the submission to the jury of this allegation; (b) The testimony of Dr. Bussman on deposition cannot be properly considered on the same basis as the opinion of an ordinary expert witness because Dr. Bussman was a party defendant, with the result that plaintiff is entitled to have his sworn statements on deposition considered as an admission by a party defendant; and (c) There was also other evidence, in addition to that testimony by Dr. Bussman on deposition, which provided sufficient support for the allegation so as to require that it be submitted to the jury.

In support of plaintiff's allegation that her hip dislocation was caused or worsened by Dr. Bussman's failure to diagnose and treat the hypothyroidism, plaintiff offered in evidence the following portions of the testimony given by Dr. Bussman on pretrial deposition on May 23, 1973, more than one year prior to the trial in November 1974:

"Q. * * * Now, is there something about the cretinism (hypothyroidism) that causes a dislocation of the hip?

"A. Yes, It's thought that this is true.

"Q. What is the reason?

"A. The epiphysis (ends) of the bones are very poorly developed, and so when the child starts weight bearing, the epiphysis either slides off, or in some instances, the epiphysis hasn't developed enough to serve as a force to deepen the hip socket, and the socket is shallow, and the hip slides out, for that reason.

"Q. Now, from your review of the records in Shannon's case at the Medical School, would you agree that she did have hip dislocation?

[ 764 ]

"* * * * *

"A. Oh, yes.

"* * * * *

"Q. And based on your examination, she did not have this when you saw her?

"A. Definitely not.

"Q. *If a diagnosis had been made at that time and treatment instituted, would this hip dislocation probably have been avoided?*

"A. You mean a diagnosis of cretinism [hypothyroidism]?

"Q. Yes.

"A. I thought you meant a diagnosis of dislocated hip. *Yes, I think, in all likelihood.*" (Emphasis added)

Appellant contends that any probative value of this testimony at that time was completely destroyed by the "correction or explanation" of that testimony at the time of trial in that: (1) All other doctors testified that the hip condition was not caused by the hypothyroidism; (2) At the time of the deposition Dr. Bussman also testified that he had not seen the X-rays, but had seen a "report" which was "controversial" and that his attorney at that time "expressly stated that he would want the doctor to reserve his opinion until a later time"; (3) Dr. Bussman's testimony on deposition was "based on his understanding at that time of the view advanced by the radiologist and the treatment then being followed at the Medical School"; (4) "[T]he radiologist's viewpoint was abandoned at the Medical School when the hip did not respond to a long period of thyroid therapy"; (5) At the time of his deposition Dr. Bussman was not aware of that fact; and (6) At trial he "explained" that "his opinion given at the time of deposition had changed because of his new information which he had gained, including the subsequent course of plaintiff's treatment at the Medical School and the definite diagnosis of congenital hip dislocation among other things."

In considering whether, in view of these contentions, all probative value of the previous testimony of

[ 765 ]

Dr. Bussman on deposition was destroyed, so as to leave no substantial evidence which the jury could properly believe, we may, at the outset, dismiss the contention that all other doctors testified that the hip dislocation was not caused by the hypothyroidism; that the "radiologist's view" was abandoned by the Medical School; and that the hip did not in fact respond to a long period of thyroid therapy. (Contentions (1) and (4) above.) Evidence to that effect by *other* testimony and exhibits would not of itself destroy the probative value of the previous testimony by Dr. Bussman. Instead, a conflict in the evidence would remain and the question of the probative value of the previous testimony by Dr. Bussman would be one to be submitted to the jury for determination unless the probative value of that testimony was completely destroyed by "correction or explanation" by Dr. Bussman himself.

For similar reasons, we must reject the contentions that Dr. Bussman did not see the X-rays, but only a "report" which was "controversial," and that his attorney wanted him to "reserve" his opinion until a later time (contention (2)), unless at the time of trial Dr. Bussman sought to "explain" the testimony given by him on deposition on these grounds. Accordingly, we must examine the subsequent testimony given by Dr. Bussman at the time of trial to see what "explanation" he gave of his former testimony on deposition and whether that "explanation" supports those contentions, as well as his remaining contentions ((3), (5) and (6)).

The "explanation" by Dr. Bussman on trial of his previous testimony on deposition was as follows:

"Q. * * * Now, in the deposition that Mr. Noble read, you indicated that you thought that the dislocated hip was caused by the hypothyroidism. Can you tell us why you expressed that opinion at that time?

"A. Yes. It was a novel theory as far as I was concerned. It was proposed by Dr. Blank, who is a pediatric radiologist at the Medical School, who had been a pediatrician before he went into radiology, and he had cited one

case from the literature, I believe—it is no more than two cases at most—where it was felt that the congenital dislocation of the hip responded and corrected itself when the hypothyroidism was treated.

"Q. And did that happen in this case?

"A. It did not.

"Q. And so what is the basis of your opinion at this time that the hypothyroidism did not cause the hip dislocation?

"A. I think general investigation on my part, discussion with orthopedists and with pediatric endocrinologists, including a couple that have testified here. I don't say I have discussed it with them but we have that further information, that states that this is an extremely unlikely relationship."

In considering whether this "explanation" is sufficient to completely destroy all probative value of the testimony given by Dr. Bussman in his previous deposition, it should first be noted that at the time of his deposition he knew that the dislocated hip had not responded to treatment, as predicted by the radiologist (who had predicted that the dislocated hip was related to hypothyroidism and would respond to treatment for hypothyroidism).[2]

---

[2]Thus, his testimony on trial was as follows:

"Q. My question, *when your deposition was taken in May of '73, did you have that knowledge that the hip had not responded to thyroid hormone?*

"A. *Yes,* I think I did because I believe Mr. Noble told us that the child or the parents—I can't recall who—that the child would be going into the hospital for further orthopedic treatment just within a week or two of our deposition."

Dr. Bussman did not attempt to "explain" the change in his opinion either by the fact that he had not seen the X-rays at the time of his deposition or by completely rejecting the theory advanced by the report of the pediatric radiologist. Although he testified on trial that "[i]t was a novel theory as far as I was concerned" at the time of his deposition, Dr. Bussman did not in any direct manner attempt to "explain" his previous testimony on deposition on the ground that such a "theory" has been subsequently found to be incorrect and had been rejected as without merit when plaintiff's hip did not respond to the treatment. Indeed, as previously noted, he was fully aware of that fact at the time of his deposition. He nevertheless testified on deposition that if a diagnosis of hypothyroidism had been made at the time of his examination and if treatment had been instituted, the hip dislocation would probably have been avoided "in all likelihood."

[767]

In our best judgment, the testimony by Dr. Bussman at the time of trial, although inconsistent with his opinion on deposition was not such a "correction" or "explanation" as to completely destroy the probative value of that earlier testimony. On the contrary, it is our opinion that it was still a question of fact for the jury to decide whether to believe the testimony by Dr. Bussman on deposition in 1973 that if a diagnosis of hypothyroidism had been made by him in 1969 and if treatment had then been instituted the dislocation would have been avoided "in all likelihood," or whether to believe the testimony given by him at the time of trial in 1974 that this was "extremely unlikely."

In reaching this conclusion we have examined decisions by this and other courts on this question and find none in which it has been held, under similar facts, that the probative value of such an earlier opinion has been so completely destroyed by subsequent testimony as to require withdrawal of such a question from the jury, rather than to leave to the jury the question of whether to believe the former or the subsequent testimony.

In *O'Lander v. Int. Harvester Co., supra,* the principal case relied upon by defendant, a consulting engineer had prepared a report based upon two inspections of equipment with an allegedly defective safety latch. In his *written report* made following his first examination he concluded that the latch was defective when manufactured. Upon subsequent inspections, however, he made new findings, based on new evidence, that the safety latch had operated properly upon manufacture. On direct examination he was asked only about the first inspection and was careful to state that such was his conclusion. *"at that time."* On cross-examination he was asked about the subsequent examination. By his testimony on cross-examination he did not attempt to *change* his previous testimony, but to *"explain"* and "clarify" that testimony by making it clear that when he testified on direct examina-

tion he did not then believe that the latch was defective, but only testified that he was of that opinion at the time of his original inspection, as shown by his written report.

Here, on the contrary, there is no contention that at the time of giving his testimony on deposition Dr. Bussman did not believe that testimony to be true and intended to say what he testified to in his deposition. What he attempted to do on trial in this case was not to "explain" or to "clarify" that testimony, at least in the limited sense in which these terms were used by this court in *O'Lander,* but to change and contradict his previous testimony by claiming that he was mistaken at that time.

The only other case cited by defendant on this question is *Birkes v. Wade,* 266 Or 598, 609-12, 511 P2d 831 (1973), in which this court, although recognizing the rule as stated in *O'Lander,* declined to apply it and held, under the facts of that case, that "the trial court erred in holding, in effect, that the jury was required, as a matter of law, to completely disregard the testimony" of the expert witness involved in that case.[3]

---

[3] A similar result was reached in *Krause v. Eugene Dodge, Inc.,* 265 Or 486, 501-02, 509 P2d 1199 (1973). For other cases on this subject see Annot., 66 ALR 1517 (1930), and subsequent cases cited as "supplemental decisions" to that annotation.

In *Washburn v. Simmons,* 213 Or 418, 323 P2d 946, 325 P2d 255 (1958), in a short per curiam opinion denying a petition for rehearing this court, without discussion of the problem, held that a trial court did not err in withdrawing from the jury an issue supported solely by opinion of a medical expert witness, *in response to a purely hypothetical question,* that "the accident aggravated the pelvic condition" when he then immediately testified on cross-examination that he was "unable to say except in terms of possibility that the accident was in any way related" to that condition. Upon examination of the record in that case, however, we find that in the course of the cross-examination of the witness additional facts were called to his attention which demonstrated quite clearly that when the witness expressed an opinion in response to the question based upon the hypothetical facts as stated in that question he was not expressing an opinion that plaintiff's injuries were caused by the accident on the basis of the acutal facts involved. Thus, when those facts were called to his attention what he then did was to "correct" the opinion testimony given by him in response to

The fact that Dr. Bussman may have had poor reasons for believing as he did at the time of his deposition may go to the weight to be accorded by the jury to that earlier testimony. It does not, however, in our opinion, "correct" or "explain" that testimony within the meaning of the rule stated by this court in *O'Lander v. Int. Harvester Co., supra,* to the extent that it destroyed all of the probative value of his previous testimony. Indeed, to hold, under circumstances such as those involved in this case, that an expert witness can deprive earlier sworn testimony of any and all probative value simply by giving good reasons for changing his mind between the time of such testimony and the time of trial would be to largely emasculate the general rule, as expressly preserved in *O'Lander* (at 388) that in the event of such a conflict the probative value of the earlier testimony "is for the jury."

Plaintiff also contends, as previously noted, that the testimony of Dr. Bussman on deposition cannot be properly considered on the same basis as the opinion of an ordinary expert witness because he was a party defendant, with the result that plaintiff is entitled to have his sworn statement on deposition considered as admissions by a party defendant, citing ORS 45.250 and *Kraxberger v. Rogers,* 231 Or 440, 373 P2d 647 (1962), in which we held (at 451-52) that "an admission by a party may be received in evidence against him even though it assumes the form of an expressed opinion."

This raises the question whether the opinion stated by Dr. Bussman at the time of his deposition was not

the hypothetical question so as to express his opinion based upon the actual facts of the case.

In our opinion, that situation was quite different from that presented in this case. In this case, by contrast, Dr. Bussman testified when his deposition was taken that if a diagnosis of hypothyroidism had been made by him at the time of his examination of plaintiff and if treatment had then been instituted, "this hip dislocation probably [would] have been avoided * * * in all likelihood." That testimony was based upon what he, as a pediatric specialist, believed to be the actual facts.

only admissible in evidence in the subsequent trial, but whether that testimony was binding upon Dr. Bussman as a judicial admission. As stated in McCormick on Evidence 637, § 266 (2d ed 1972), the courts have taken different approaches to this problem and it has not been directly decided by this court.[4]

Because, however, we have held that the probative value of the opinion stated by Dr. Bussman on his previous deposition was not completely destroyed by his subsequent testimony on trial, regardless of whether that previous opinion be considered as an admission of a party defendant, we need not decide this additional question at this time.

■ We would observe, however, that when the previous testimony involved is in the form of an opinion by a party defendant in a previous deposition or trial, the courts should be particularly careful in the application of the rule as stated in *O'Lander v. Int. Harvester Co., supra,* relating to "explanation" or "correction" of such a previously expressed opinion. To do otherwise would be to encourage parties who have given such previous testimony, and who face subsequent trials, to seek all possible "explanations" of their previous testimony, not only in the hope that the jury will disbelieve such testimony, but also in the hope that the court will refuse to permit the opposing party to offer the previous testimony in evidence for consideration by the jury.

As also previously noted, plaintiff contends that even if all probative value of Dr. Bussman's testimony on deposition was destroyd by his subsequent "explanation," there was other evidence sufficient to support submission to the jury of the allegation of plaintiff's complaint that her hip dislocation was caused or worsened by Dr. Bussman's failure to diagnose and treat the hypothyroidism.

---

[4]See also Annot., 169 ALR 798 (1947).

Again, we need not consider that question in view of our holding that Dr. Bussman's previous testimony on deposition had sufficient probative value so as to support the submission of that allegation to the jury. We would note, however, that among other evidence on this question were the records of the University of Oregon Medical School relating to plaintiff's diagnosis and treatment. Those records were received without objection and include the following statement of the opinion by Dr. Blank, the pediatric radiologist:

"SKELETAL EXAMINATION: 10/21/71 Dictated 10/25/71

Signs of immaturity, and signs suggestive of hypothyroidism, are present everywhere: The skull contains many wormian bones; the cortexes of some of the long bones, especially the femurs and tibias, are thickened; L1 is 'bullet-nosed' and only five ossification centers are present in the left half of the skeleton, approximately par for a month of age. Also, the right femur is dislocated at the hip.

"IMPRESSION: Skeletal immaturity, hypothyroidism; *the dislocation at the right hip may be expected to disappear with thyroid treatment* (see page 596 of Caffey V Ed.).

"Eugene Blank, M.D./va—10/27/71"
(Emphasis added)

The same records also include the following entry on October 28, 1971 as an Intern Off Service Note:

"* * * Child has congenital hip on (right). *Some literature reports resolution of this in hypothyroid children after Rx (with) hormone. Dr. Blank feels very strongly about this* so if begin surgical Rx be prepared to defend yourself." (Emphasis added)

Although this evidence may not have been sufficient in and of itself to require the submission of this issue to the jury, it nevertheless supports the opinion by Dr. Bussman at the time of his deposition and it was for the jury to decide whether or not to believe that testimony.[5]

_____
[5] In defendant's reply brief it is contended that a party may not properly "obtain expert testimony from an adverse party" and that such testimony is

2. *It was not error to submit to the jury plaintiff's allegation that the dislocation of her hip will cause permanent disability.*

Defendant contends that there was no "competent evidence" that the dislocation of plaintiff's hip will result in any permanent disability and that "in the absence of any evidence *tending to prove* that the hip dislocation was permanent or would result in permanent disability," within the rule as stated in *Skultety v. Humphreys,* 247 Or 450, 457, 431 P2d 278 (1967), the trial court erred in failing to grant defendant's motion to withdraw that allegation from consideration by the jury.

As previously noted, defendant's testimony described plaintiff's dislocated hip as involving a failure of the epiphysis (end) of the bone to develop, with the result that when the child started "weight bearing" it either "slides off" or does not "serve as a force to deepen the hip socket" and "the socket is shallow and the hip slides out."

As also previously noted, the hip did not "relocate" after a long period of thyroid therapy. According to records in evidence, plaintiff was subsequently admitted to the hospital for orthopedic treatment. Traction was then attempted, but was also unsuccessful. Treatment by "closed reduction" involving the insertion of a "pin" was then attempted, but was also unsuccessful and the prognosis for such treatment was "very poor," according to the same records.

It also appears from these medical records that the only further or alternative course or method of treatment suggested by the doctors in charge was an "open reduction of the hip," a surgical procedure requiring a

not sufficient to make a prima facie case, at least when based upon testimony given on deposition, citing Annot., 88 ALR2d 1186-1188 (1963). No such contentions were made, however, at the time of trial in support of defendant's motion to strike the allegation which is the subject of this assignment of error.

blood transfusion, which plaintiff's parents would not permit because of their religious beliefs, as discussed below.

At the time of defendant's motion to withdraw from the jury the allegations of plaintiff's complaint that the dislocation of her hip "will cause permanent disability," the trial judge observed that "she will have [a permanent disability] if left untreated" and that "[i]f it is untreated, * * * there isn't any * * * socket for the ball to go into * * *." The response by defendant's counsel was "* * * this requires medical testimony" and that "[i]t is untreated because of their refusal to have it treated."

Aside from the refusal of plaintiff's parents to submit to surgery requiring a blood transfusion (as discussed separately), we are of the opinion that the foregoing evidence was sufficient as the basis for submission to the jury of the question whether plaintiff's dislocated hip "will cause permanent disability," unless treated by such surgery. We believe that such evidence, which includes the records of observations and findings by plaintiff's treating doctors, was evidence "tending to prove" that the hip dislocation will be permanent unless treated by such surgery, within the meaning of the rule as stated in *Stultety v. Humphreys, supra,* despite differences in the facts of that case. We also believe that with such evidence in the record plaintiff was not required to call another doctor to testify, as a matter of medical opinion, to that question of ultimate fact.[6]

_____

[6]Because of the basis upon which we reach this conclusion we need not decide whether plaintiff is correct in the contention that "the issue of permanency is virtually always for the jury where surgery is required to correct a physical injury," citing *Zimmerman v. Ausland,* 266 Or 427, 513 P2d 1167, 62 ALR3d 1 (1973) (in which there was such medical testimony) or whether defendant is correct in contending that the facts of this case are not such as to permit the jury to infer permanency without a medical opinion to that effect, citing *Smitson v. Southern Pacific Co.,* 37 Or 74, 95, 60 P 907 (1900) (amputation of both legs).

3. *It was not error to decline to give a requested instruction relating to the failure of plaintiff to use reasonable care in caring for her injuries.*

Defendant also relies upon the rule that a person injured by the tort of another has a duty to exercise the diligence of an ordinary prudent person to minimize the damages, again citing *Skultety v. Humphreys, supra* at 459. Defendant then contends that "plaintiff's evidence shows that reasonable steps have not been taken to correct the condition" in that "the recommended surgery had not been performed," with the result that it was error not to give defendant's requested instructions to that effect.[7]

The question whether a plaintiff who has suffered a permanent injury has a duty to "mitigate" his damages by submitting to surgery depends upon a proper application of the doctrine of "avoidable consequences." The general rules for application of that doctrine in such cases have been set forth in *Zimmerman v. Ausland,* 266 Or 427, 513 P2d 1167, 62 ALR3d 1 (1973), including the following (at 432):

> "In considering whether plaintiff is required to mitigate her damages by submitting to surgery we must bear in mind that while plaintiff has the burden of proof that her injury is a permanent injury, defendant has the bur-

---

We do not regard *Smitson* as a case in point on this question. See *Denton v. Arnstein,* 197 Or 28, 50-51, 250 P2d 407 (1952); *Hecker v. Union Cab Co.,* 134 Or 385, 392, 293 P 726 (1930); Annot., 115 ALR 1149 (1938).

[7]Defendant's requested instruction was as follows:

"I instruct you that it is the duty of an injured or ill person to use reasonable care and dilligence in caring for his injuries and to use reasonable means to prevent such injuries from becoming aggravated or worse and to accomplish healing and recovery as soon as possible.

"If you find from a preponderance of the evidence that the plaintiff did not use reasonable care and diligence in caring for his child's injuries and did not follow medical advice and if you further find that such injuries became aggravated or worse or required a longer time to heal as a result of such failure, then plaintiff cannot recover for the consequences of his own failure to exercise such reasonable care and diligence nor to follow medical advice."

den of proving that plaintiff unreasonably failed to mitigate her damages by submission to surgery. McCormick, *supra,* 130, § 33. Cf. *Kulm v. Coast-to-Coast Stores,* 248 Or 436, 440, 432 P2d 1006 (1967)."

and (at 434):

"The factors to be considered for this purpose ordinarily include the risk involved (i.e., the hazardous nature of the operation), the probability of success, and the expenditure of money or effort required. See Annot., 48 ALR2d 366-372 (1956). Some courts also consider the pain involved as a factor, but no such question is presented for decision in this case. See 48 ALR2d, *supra,* 369."

We also said (at 437) quoting McCormick on Damages 136-37, § 36 (1935), that:

"* * * [T]he courts * * * are cautious about insisting that due care requires submission to an operation."

Few cases discuss the application of these rules to cases in which a plaintiff has refused to submit to surgery for reasons of religious belief[8] and to cases in which it is contended that negligence by the parents of a child in failing or refusing to consent to surgery for the child would, or would not, bar recovery by or on behalf of the child.[9]

We need not decide these questions in this case, however, because defendant failed to sustain his burden to prove that under the circumstances of this case a reasonable person would have submitted to surgery. No evidence was offered by defendant upon the various "factors to be considered for this purpose," as stated in *Zimmerman.*

---

[8] See *Booth Tank Co. v. Symes,* 394 P2d 493 (Okla 1964); and *Miller v. Hartman,* 140 Kan 298, 36 P2d 965 (1934). Cf. *Troppi v. Scarf,* 31 Mich App 240, 187 NW2d 511 (1971), and Annot., 30 ALR2d 1138 (1953).

[9] See Annot., 62 ALR3d 9, 16 (1975); 1 Sedgwick on Damages 387-90 (9th ed 1912); *Gigoux v. Yamhill County,* 73 Or 212, 221-22, 144 P 437 (1914); *Clark v. City of Chicago,* 174 111 App 145 (1912); and *Louisville & N.R.R. Co. v. Wilkins,* 143 Ky 572, 136 SW 1023, 1025 (1911). Cf. *Oviatt v. Camarra,* 210 Or 445, 449-50, 311 P2d 746 (1957); and *Woosley v. Dunning,* 268 Or 233, 252, 520 P2d 340 (1974).

Defendant contends only that "*plaintiff* offered no evidence * * * that such recommended surgery would be unsuccessful." Defendant also contends, without discussion of these various "factors," that "plaintiff's evidence shows that reasonable steps have not been taken to correct the condition so as to reduce or avoid any possible disability." The only evidence referred to by defendant in support of this contention, however, is that plaintiff's mother testified that surgery was recommended by the doctors at the medical school in May 1973; that the surgery was not performed because of the potential need for a blood transfusion, which would be contrary to the religious beliefs of plaintiff's parents, and that plaintiff's father testified that "we have got another appointment for them to have a look at this hip."

As previously stated, the burden was upon defendant, rather than upon plaintiff, to offer evidence from which a jury could properly find that under the circumstances of the case a reasonable person would have submitted to surgery, including evidence on each of the various "factors" to be considered for that purpose. We hold that defendant failed to offer evidence sufficient to sustain its burden of proof on this issue and that the evidence offered by plaintiff was also insufficient to entitle defendant to demand that this issue be submitted to the jury.

4. *Any error in joining plaintiff's claim against Dr. Bussman with her claim against Dr. Meuhleck was not prejudicial.*

Defendant contends that there was an improper joinder of plaintiff's claim against Dr. Bussman with her claim against Dr. Meuhleck and raised that issue by plea in abatement, by affirmative answer, and by motions for nonsuit and directed verdict.

ORS 16.220, as amended in 1973, provides that a plaintiff may unite several causes of action in the same complaint where, among other things, they all

arise out of "[t]he same transaction or transactions or occurrences."[10] In this case there were not only separate defendants, but they acted independently of each other and during different periods of time, although they all dealt (without realizing it) with plaintiff's condition of hypothyroidism. This court has not yet construed the term "same transaction or transactions or occurrences" under such facts. Similar statutory provisions in other states have been the subject of "the most diverse interpretation by the courts." See Clark, Code Pleading 452-56, § 69 (2d ed 1947).

Even if we should hold that there was an improper joinder of causes of action in this case, however, it does not follow that the verdict and judgment (which was against Dr. Bussman alone) must be reversed. In *McGrath v. White Motor Corp.,* 258 Or 583, 590-91, 484 P2d 838 (1971), this court rejected the contention that a judgment for plaintiff should be reversed for improper joinder of causes of action against several defendants, and said:

> "* * * [I]f there was a misjoinder, it was not prejudicial. As Judge Clark comments: 'The purpose of this rule [limiting joinder] is to prevent too wide a field of litigation and too diverse issues in a single suit, and thus to avoid a case of undue confusion and complexity.' Clark, Code Pleading, supra at 434. As we view the record in this case, the joining of several causes of action did not bring about undue confusion and complexity." (Brackets in court's opinion.)

The court went on (at 258 Or 591) to quote ORS 16.660, providing that:

> "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party."

We believe that the same considerations are also applicable in this case. Because the jury found only the defendant Dr. Bussman to have been negligent and found that Dr. Muehleck was not liable, we do not

---

[10] Oregon Laws, 1973 ch 59, § 1.

believe it likely that the jury was confused by evidence relating to the conduct of Dr. Meuhleck in its consideration of the conduct of Dr. Bussman. Indeed, it has been suggested that more confusion might have resulted if the actions had been tried separately against the various defendants. Then each would probably have tried to "pin" any blame on the other absent defendant and, because of the other's absence and inability to present evidence, the jury in each case would have been deprived of a full picture of the events.

5. *It was not error to reject defendant's requested instructions on apportionment of damages in view of instructions given and the verdict against defendant Bussman alone.*

Defendant Bussman contends that the trial court erred in instructing the jury to the effect that if it found both defendants to be negligent and that the negligence of each was "a substantial factor in causing a single injury," then each would be responsible for the whole injury[11] and in failing to give defendant's requested instruction that there was *not* a single, indivisible injury, as a matter of law, and that defendant Bussman could not be responsible for any injury suffered by plaintiff prior to the time when he undertook to treat her, among other requested instructions.[12]

---

[11]The instruction complained of was as follows:

"If you find that each of the defendants was negligent and that this negligence of each was a substantial factor in causing a single injury to the plaintiff, then each of the negligent defendants is responsible for the whole injury to the plaintiff, even though his negligence alone might not have caused the entire injury, or the same damage might have resulted from the negligence of one or both of the defendants."

[12]The requested instructions were as follows:
"XVI
"I instruct you that the plaintiff may not recover in this case for any condition which was not caused by the negligence, if any, of the defendants.

"I instruct you that each defendant involved in this case cannot be responsible for any injury or damage which occurred or which the child suffered prior to the time he undertook to treat the child.

In support of this contention defendant contends that this was an appropriate case for an apportionment of damages between the doctors involved under the rule stated by this court in *Waterway Terminals v. P. S. Lord,* 256 Or 361, 372-73, 474 P2d 309 (1970), "where a logical basis can be found for such rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused."[13]

Plaintiff contends, on the contrary, that if the jury believed testimony offered by plaintiff to the effect that if hypothyroidism had been diagnosed by Dr. Bussman and treated at that time, "the odds would be 65 to 70 percent that she would have had an IQ that was normal or only slightly reduced," the jury could have found that the negligence of both Dr. Meuhleck and Dr. Bussman "was a substantial factor in causing a single injury," within the meaning of the rule as stated in *Smith v. J. C. Penney Co.,* 269 Or 643, 656-57, 525 P2d 1299 (1974), and *Woosley v. Dunning,* 268 Or 233, 254-55, 520 P2d 340 (1974).

"If you cannot determine what, if any, injury may have resulted from treatment given by or lack of treatment, if any, by a defendant, then plaintiff has failed in his burden of proof as to that defendant.
"* * * * *

"The following are submitted as separate instructions, requested to be given in sequence:
"XXI A
"I instruct you as a matter of law that there is not a single, indivisible injury in this case.
"XXI B
"I further instruct you that Defendant Bussman is not responsible for damages which occurred before his treatment of the child.
"XXI C
"Therefore, as to the Defendant Bussman, you are instructed that in the event you find liability against him, he can only be responsible for the damages, if any, which plaintiff proves were (alternative— which were) incurred by the child subsequent to the time that a diagnosis of the condition would have reasonably resulted in treatment of the condition."

[13] Although in that case we quoted the foregoing rule, as stated in Prosser, Torts 248, § 42 (3d ed 1964), we declined to apply that rule in that case. See also *Smith v. J. C. Penney Co.,* 269 Or 643, 656, 525 P2d 1299 (1974).

■■    Because a claim of error relating to instructions must be considered in the light of the instructions as a whole given by the trial court, it is important to note that the court instructed that if the jury found only one of the two defendants was negligent in a particular which caused harm to the plaintiff, it was to return its verdict only against that defendant for "* * * such damages as you find plaintiff has sustained as a result of that defendant's negligence." The court further instructed that there were "two separate defendants" and that "* * * each of them has the right to have you consider his case separately, one from the other," and that "* * * although two or more physicians treat the same patient, neither is liable for the acts or omissions of the other, if they are acting independently."[14]

■    In our opinion, these instructions fairly covered the substance of the instructions requested by defendant, except as they related to defendant's contention that there was not a "single indivisible injury" as a matter of law.

It is true that the court then went further and gave the instructions complained of to the effect that if the jury found *both* Dr. Meuhleck and Dr. Bussman to be negligent and that the negligence of each was a "substantial factor in causing a single injury to the plaintiff," each would be responsible for the whole injury. The jury, however, did not find both defendants to be liable. Instead, by its verdict against Dr. Bussman

---

[14]The instructions given on this subject were as follows:

"Now, ladies and gentlemen, in this case we have the separate defendants, and, as I indicated to you, each of them has the right to have you consider this case separately, one from the other. I instruct you that, although two or more physicians treat the same patient, neither is liable for the acts or omissions of the other, if they are acting independently.

"If you find that only one defendant was negligent in a particular which caused harm to the plaintiff, in a particular as stated in the complaint, and if you find that the other defendant was not negligent, then you will return your verdict only against the defendant whom you find to be liable to the plaintiff and you will award the plaintiff, against that defendant, such damages as you find plaintiff has sustained as a result of that defendant's negligence."

alone it found that Dr. Meuhleck either was not negligent or that any such negligence was not the proximate cause of plaintiff's injury. It follows that it was not necessary for the jury to proceed to the further question whether the negligence of both combined to cause "a single injury" and, if so, whether each was responsible for such an injury.

It may be, as also contended by defendant, that no one knows why the jury returned a large verdict against Dr. Bussman and none against Dr. Meuhleck. In any event, we believe that this is a proper case for application of the rule that an instruction, even though erroneous, is not grounds for reversal where "* * * the verdict has rendered the defendant's contention moot or purely abstract."[15]

For these reasons we need not consider whether this was a case in which defendant was entitled to an instruction to the effect that the injury was divisible and that the damages must have been apportioned, as a matter of law.[16]

6. *It was not error to deny defendant's motion for a directed verdict on the ground that damages were speculative.*

In support of defendant's contention that it was error to deny his motions for nonsuit and directed verdict it is also contended that plaintiff's medical experts

---

[15] *Hamilton v. Redeman,* 163 Or 324, 331, 97 P2d 194 (1939). See also *Brown v. Johnston,* 258 Or 284, 293, 482 P2d 712 (1971); *Litty v. Farley,* 219 Or 208, 216, 347 P2d 47 (1959).

[16] Defendant also contends in his brief that this was one reason why his plea in abatement or affirmative defense and his motion for nonsuit or directed verdict should have been granted. As we read those pleadings and motions, however, it appears that they are limited primarily to the contention that there was an improper joining of two causes of action. Although that contention may be related to the question of apportionment of damages, we believe that it is also disposed of by the fact that the jury was instructed that if it found only one defendant to be negligent it was to return a verdict against that defendant only for such damages as were sustained by or as a result of negligence of that defendant and by the return by the jury of a verdict against Dr. Bussman alone, as previously discussed.

[ 782 ]

agreed that defendant could not have made the diagnosis of hypothyroidism on plaintiff's first visit and that there was no evidence of *when* defendant could or should have made the diagnosis of hypothyroidism or *how much* mental retardation occurred between the time when he first saw plaintiff and the "unspecified date" when he could have made the diagnosis. Thus, it is contended that the jury was required to speculate on the issue of defendant's liability for additional damage which may have occurred by his failure to take steps to make the diagnosis and that "[j]udgments cannot rest on speculation or conjecture, there must be substantial evidence for their support."

Upon examination of the record we find that defendant himself testified that a pediatrician is supposed to be "a developmental expert"; that during the first year of life of an infant pediatricians do "general checks" to "assess their progress and development"; that "growth charts" are used for that purpose and that failure of growth and development are "signs that are seen in hypothyroidism."

Other medical expert witnesses testified that a pediatrician who performs a physical examination of a child during its first year of life should check its height and weight against its height and weight at birth to determine whether something is wrong with its growth or development; that if there is a substantial deviation from the "percentile line that the child has achieved on the growth chart * * * this is a warning flag that should be further investigated"; that hypothyroidism is "one of the things that must be considered"; that under such circumstances it is the obligation of the pediatrician "to perform a physical examination and appropriate laboratory tests to determine the cause," and that if that had been done "the diagnosis of hypothyroidism would have been made."

It is true that no medical witness testified that defendant should have made such a diagnosis on his first examination of plaintiff or exactly when he

should have done so. In our opinion, however, if the jury believed the testimony offered by plaintiff it could properly have found that even upon defendant's first examination he should have recognized that plaintiff was so far retarded in her development that he should have undertaken a further investigation to determine the cause, including laboratory tests, and that if he had done so he should have made a diagnosis of hypothyroidism within a relatively short period of time.

Plaintiff also offered testimony that if such cases are treated within three months, "the odds are probably seven out of eight that she would have an IQ of about 85 or 90" (within the normal range); that if plaintiff had been treated between six and 14 months, there is a 65 or 70 percent chance that her IQ would have been above 75; and that if treated beyond 14 or 15 months, she "is almost surely going to have some reduced IQ, probably below 70." Plaintiff, at age 6 had an IQ of 41.

We believe that if the jury believed this evidence, as it was entitled to do, it could have properly found that defendant, who first examined plaintiff when she was 10 months old, should have made the diagnosis of hypothyroidism well within the six to 14-month period, during which it was reasonably probable that the prompt undertaking of treatment would have resulted in her having an IQ of 75 or better and that, as a matter of reasonable probability, defendant's failure to make a reasonably prompt diagnosis resulted in at least some substantial impairment of her mental development.

Defendant cites *Wintersteen v. Semler,* 197 Or 601, 636, 250 P2d 420, 255 P2d 138 (1953), for the proposition that in such cases it must be established with "reasonable certainty that the damages sought resulted from the act complained of."

In cases involving personal injuries, however, it is the rule that in order to establish the necessary causal

relationship it is sufficient to establish that the injurious consequences were the "probable" result of the conduct complained of. See *Feist v. Sears, Roebuck & Co.,* 267 Or 402, 407, 517 P2d 675 (1973). Cf. *Continental Plants Corp. v. Measured Marketing Service,* 274 Or 621, 547 P2d 1368 (1976). We believe that the evidence in this case was sufficient to satisfy that requirement.

Defendant also contends, as previously noted, that the evidence was insufficient to show *how much* additional retardation resulted from the failure of Dr. Bussman to make a prompt diagnosis of hypothyroidism, including the amount of mental retardation that may have occurred prior to the date when a correct diagnosis would have been made by him.

We believe, however, that the correct rule for application in considering this question under the facts of this case is stated in *Fehely v. Senders,* 170 Or 457, 135 P2d 283 (1943). In that case, after reference to the desirability that there be definiteness of proof both that harm resulted from defendant's wrongful conduct and also "as to the amount of damage as far as is reasonably possible," this court went on (at 471) to say, quoting from 4 Restatement of Torts 575, § 912, comment *a* (1939):

> " '* * * It is even more desirable, however, that an injured person shall not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered. Particularly is this true in situations where there can not be any real equivalence between the harm and compensation in money, as in case of emotional disturbance, or where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof, * * *.' "

This is consistent with the view expressed earlier in *Hinish v. Meier & Frank Co.,* 166 Or 482, 506, 113 P2d 438 (1943), although under different facts.

For these reasons, we hold that it was not error to deny defendant's motion for a directed verdict.

## 7. It was not error to fail to receive in evidence a letter from the Columbia County Health Department.

Defendant's final assignment of error involves the failure of trial court to receive in evidence a letter from the Columbia County Health Department to the University of Oregon Medical School referring plaintiff to it for treatment. The letter was dated June 8, 1971 and refers, among other things, to an incident in January 1970 at which time plaintiff was seen at a county "immunization clinic," as well as references to plaintiff's treatment by Dr. Bussman later in 1970. It was signed by a "Senior Public Health Nurse." The "supervising nurse" testified that "we have the copy in our chart" and that it "comes from the file" and was "a record kept in the ordinary course of business."

Upon examination of the letter, we find that its contents did not go to the vital issues of the case, but had some probative value. ORS 41.690 provides, however, that to be admissible as a business record a document must have been made "at or near the time of the act, condition or event." It appears on the face of the letter that this requirement was not satisfied, at least as to some of the events referred to in that letter, even if it was otherwise admissible as a business record.[17] Accordingly, the trial court did not err in rejecting the letter despite the fact that the objection (although including the general ground of "hearsay"), was not made on that specific ground.[18]

For all of these reasons, the judgment of the trial court is affirmed.

---

[17] See *Allan v. Oceanside Lumber Co.*, 214 Or 27, 48, 328 P2d 327 (1958).

[18] See *Pumpelly v. Reeves*, 273 Or 808, 543 P2d 682 (1975).

Defendant also contends in his brief (but not on trial) that the letter "may also be admissible" as an "official record" under ORS 43.370.

In applying that statute, however, this court has held that it must be shown that the person making the record had "firsthand knowledge" of the facts—a requirement not satisfied in this case. See *Finchum v. Lyons,* 255 Or 216, 218-20, 465 P2d 708 (1970), and *Wynn v. Sundquist,* 259 Or 125, 132-35, 485 P2d 1085 (1971).