Argued November 4, reversed and remanded December 6, 1977, petition for rehearing denied January 17, 1978

DASKALOS et al, *Appellants,*
*v.*
KELL et al, *Respondents.*
(TC 416 577, SC 25010)

571 P2d 141

Daniel H. Skerritt, of Lindsay, Nahstoll, Hart & Krause, Portland, argued the cause and filed the briefs for appellants.

I. Franklin Hunsaker, of Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland, argued the cause for respondents. With him on the brief was Albert A. Menashe, Portland.

Before Denecke, Chief Justice, and Holman, Tongue, Bryson and Linde, Justices, and Gillette, Justice Pro Tempore.

TONGUE, J.

## TONGUE, J.

This is an action for damages against a lawyer for legal malpractice. The case was tried before a jury, which returned a verdict in favor of the plaintiffs in the sum of $23,005.65. The resulting judgment was then set aside by the trial court on its own motion and a new trial was ordered by it on the ground that although there was evidence from which the jury could have found that defendants were negligent, the plaintiff Daskalos was "as a matter of law also negligent" and was therefore barred from recovery.

Plaintiffs assign as error the entry of the order setting aside the judgment and ordering a new trial. In support of that assignment of error plaintiffs contend that there was a conflict in the evidence whether plaintiff Daskalos was guilty of contributory negligence and there was substantial evidence which, if believed by the jury, supported its finding that he was not negligent.

Defendants contend, on the contrary, that the trial court properly granted a new trial on its own motion "based upon clear evidence of plaintiffs' substantial contributory negligence"; that under ORS 17.630 this court has accorded "wide latitude to a trial court in ordering a new trial based upon its own motion"; that in cases of legal malpractice "the trial court must determine questions of contributory negligence in the light of his specialized skill and knowledge regarding the standard of care required of an attorney"; that the order of the trial court was supported by substantial evidence; and, finally, that:

> "The issue before this Court is *not* whether there is some evidence in the record to support the jury's determination below, but rather *whether there is substantial evidence in the record to support the trial court's granting of a new trial.*" (Emphasis theirs)

■ It is true that this court held in *Beglau v. Albertus,* 272 Or 170, 188, 536 P2d 1251 (1975), cited by defendants, that "wide latitude" will be accorded by

[ 533 ]

this court to a trial court "in determining whether error is prejudicial" so as to require the granting of a new trial on its own motion.[1] It does not follow, however, that the trial court may properly order a new trial when there was no error in the admission of evidence, instructions to the jury, or otherwise in the conduct of the trial, and when the sole contention was that the case should not have been submitted to the jury, in spite of conflicting evidence, because there was "substantial evidence in the record to support the trial court's granting of a new trial."

On the contrary, it is well established by this court that the granting of a new trial in such a case is error by reason of the provisions of Art VII, § 3 (Amended) of the Oregon Constitution, which expressly provides that:

> "In actions at law * * * no fact tried by a jury shall be otherwise re-examined in any court of this state, *unless the court can affirmatively say there is no evidence to support the verdict. * * *"* (Emphasis added)

■ This is the rule which must, by reason of Art VII, § 3, be applied by the Oregon courts in cases involving motions for orders to set aside jury verdicts and to grant either new trials or judgments notwithstanding jury verdicts when, as in this case, the decisive issue is the sufficiency of the evidence. Thus, as held recently in *Jacobs v. Tidewater Barge Lines, Inc.,* 277 Or 809, 562 P2d 545 (1977), although involving a judgment n.o.v.:

> "On that assignment of error, unless we can affirmatively say there is no evidence to support the verdict, it must be reinstated. Our inquiry on review, therefore, is to search the record to ascertain whether it contains evidence which supports the verdict. In performing our function, we do not weigh the evidence. We are required to accept as being true all evidence and inferences therefrom in the light most favorable to the party who

---

[1] In that case the error found by the trial court to be prejudicial was an improper instruction to the jury.

prevailed before the jury. This necessitates resolving any conflicts in the evidence in favor of that party."

This court has also held that the same test must be applied in medical malpractice cases in affirming jury verdicts in cases in which the evidence was conflicting. Thus, in *Hansen v. Bussman,* 274 Or 757, 759, 549 P2d 1265 (1976), we said that:

> "Because of direct conflicts in the testimony it must be kept in mind that after a jury verdict in favor of the plaintiff, this court is required to resolve all conflicts in the testimony in favor of the plaintiff and that plaintiff is entitled to the benefit on this appeal of all evidence favorable to her and of all inferences which may be reasonably drawn from such evidence. * * *"

■ Obviously, the same rule must also be applied to a jury verdict in a legal malpractice case. *Cf. Oregon Auto Ins. Co. v. Fitzwater,* 271 Or 249, 258-59, 531 P2d 894 (1975).

■ The same rule must also be applied in cases in which the decisive issue is whether a plaintiff's conduct was such as to make him guilty of contributory negligence. Thus, this court held in *Ballard v. Rickabaugh Orchards, Inc.,* 259 Or 200, 203-04, 485 P2d 1080 (1971):

> "* * * In considering this assignment, the evidence must be viewed in the light most favorable to plaintiff and she must be accorded the benefit of every reasonable inference and intendment which may be drawn therefrom. *French v. Christner,* 173 Or 158, 135 P2d 464 *decided on the merits* 143 P2d 674 (1944). Unless it can be said that plaintiff's alleged contributory negligence was established so clearly, conclusively and unequivocably that all reasonable minds could not differ on the matter, the issue was properly submitted to the jury. [Citing cases]." (Emphasis theirs)

To the same effect, see *Clark v. Strain,* 212 Or 357, 359, 319 P2d 940 (1958).[2]

---

[2] When, as in this case, it is contended by plaintiff Daskalos, as a layman, that he was not guilty of contributory negligence because he acted in reliance upon advice from his attorney, we must also bear in mind, as held in *Collins v. Fitzwater,* 277 Or 401, 560 P2d 1074 (1974), that laymen "must often rely upon the expertise and diligence" of their attorneys.

We must therefore reject defendants' contention that the issue before this court is *not* whether there is some evidence in the record to support the jury verdict in this case, but whether there was substantial evidence to support the trial court's order granting a new trial. We thus turn to a consideration of the evidence in this case, which, as previously stated, we must consider in the light most favorable to the plaintiffs.

The controversy in this case involves the Bayview Osteopathic Clinic, an Oregon professional corporation originally owned by Dr. Robert C. Todd. On April 1, 1972, Dr. Todd sold 499 of the 1,000 outstanding shares in the corporation to plaintiff Daskalos for $22.50 per share, for a total purchase price of $11,250.

At that time Dr. Todd and plaintiff Daskalos executed a Stock Retirement Agreement (SRA) which provided that if either party desired to sell his shares of stock, the purchase price was to be established by alternative formulas as set forth in Paragraph 3 of the SRA.

The first formula, as stated in Paragraph 3.1, applied in the event of a sale of stock prior to March 31, 1974. In that event, it was provided that:

"* * * [T]he purchase price of each share of stock shall be $22.50, plus or minus any increase or decrease in the adjusted net worth per share of the Corporation's issued and outstanding common stock, as determined by the accountant regularly employed to maintain the books of the Corporation, between April 1, 1972 and the date of the event requiring such purchase."

The second formula, as stated in Paragraph 3.2, applied in the event of a sale of stock on or after April 1, 1974. In that event, it was provided that the price of each share should be either (a) "an agreed price determined by negotiations," or (b) if there was no such agreed price, at a price to be determined by the corporation's accountant by dividing the number of outstanding shares "into":

"(1) The stated capital and paid-in surplus of the Corporation; plus

"(2) The full amount of accounts receivable of the Corporation less a 25% bad debt and collection discount; less

"(3) Any unearned fees for obstetric services; less

"(4) The provision for income, payroll and property taxes to be paid by the Corporation."

In late March or early April of 1973 Dr. Todd decided to sell his stock in the corporation. Plaintiff Daskalos then engaged the services of Lee Kell, a partner in defendants' law firm. Mr. Kell took notes during his conference with plaintiff Daskalos which include the statement that "Stock Retirement Agreement sets formula for buy-out." Because the sale of stock was to be prior to March 31, 1974, the applicable formula was as stated in Paragraph 3.1, i.e., $22.50 per share "plus or minus any increase or decrease in the adjusted net worth per share," as determined by the corporation's accountant.

Lee Kell then met with the attorney representing the corporation to "work out a suggested purchase price" and also talked with the corporation's accountant. On May 8, 1973, Mr. Kell wrote a letter to plaintiff Daskalos stating that he had talked with that attorney and that accountant; that "we have reviewed your stock purchase agreement with Dr. Todd," as well as the Stock Retirement Agreement, and that "based on these materials, we suggest a buy-out price of Dr. Todd by the corporation of $62,508.00," less the value of certain insurance. The letter then set forth a "breakdown" of the various items included in arriving at that amount, including the following:

"Add portion of contribution to profit
  sharing plan which will benefit Dr.
  Daskalos on forfeiture of Dr. Todd's
  interest                                              $ 4,131.37

"Dr. Todd's share of discounted accounts
  receivable                                              44,338.50

The letter went on to state, among other things, that:

> "The accounts receivable allocation was computed by discounting the estimated value of the accounts receivable of $118,000.00 by 25%, or $88,500.00, and multiplying that by Dr. Todd's interest in the corporation of .501, with a result of $44,338.50. This formula could be used for the balance of the accounts receivable as of May 31, 1973, or any other date. The 25% discount has some merit as it appears as an agreed discount figure on page 6 of the stock retirement agreement, albeit this formula would not be in effect unless this retirement took place after April 1, 1974. * * *."

In the opinion on which the order for a new trial was based, the trial judge stated, after referring to these portions of the letter of May 8, 1973, that:

> "* * * It is inescapable that Dr. Daskalos was well aware that defendant Kell was employing values not contemplated by Paragraph 3.1 of the SRA. While there was evidence that defendant Kell advised the plaintiff to execute the 1973 purchase agreement, there was no evidence to the effect that defendant Kell misadvised plaintiff relative to his legal obligations, i.e., he did not advise plaintiff that Paragraph 3.1 was unenforceable or that plaintiff was compelled to buy the corporate stock at Dr. Todd's price. The jury could have concluded defendants were negligent. Plaintiff, however, was as a matter of law also negligent and he, therefore, is barred from recovery under the theory advanced in Count 1 of his complaint."

Additional evidence, however, appears from the record. Plaintiff Daskalos testified that Lee Kell never talked to him about increasing the purchase price "beyond what was required by the Stock Retirement formula for any purpose" and that "as far as [he] was concerned that formula was applying" and "that is what Mr. Kell had advised [him]."

It also appears that the first draft of the buy-out agreement as prepared by the attorney for the corporation and sent by him to Mr. Kell, included the following:

"* * * Under the terms of the April 1st Agreement, the purchase price for the shares of stock of the Corporation owned by Dr. Todd was to be established pursuant to a certain formula in the event Dr. Todd withdrew from the Corporation prior to April 1, 1974. *The parties to this Agreement now recognize that such formula does not appropriately measure the present value of Dr. Todd's interest in the Corporation. * * *"* (Emphasis added)

That attorney testified that "pursuant to Mr. Kell's request" the last sentence was changed to read:

"* * * Under that formula the parties to this Agreement have established the present value of Dr. Todd's interest in the Corporation."

The final stock purchase agreement, as signed by the parties on June 1, 1973, included that change. Apparently, however, plaintiff Daskalos was not informed of the nature of the change. The first draft of the agreement was not sent to him and he saw only the final draft, stating that the present value of Dr. Todd's stock had been established "under that formula," as provided by the SRA.

In addition, the final draft of the buy-out agreement was sent to plaintiff Daskalos by Mr. Kell with a letter dated May 23, 1973, stating, among other things, that:

"The only changes made in the Agreement suggested by Dr. Todd were the last two sentences in the second paragraph on the first page. Both Mr. Carskadon and I agreed that my revision more appropriately represents the situation."

This, again, referred to the statement to the effect that the present value of Dr. Todd's stock had been established "under that formula."

Dr. Daskalos testified that he did not learn until March 1975 that the price of $58,005.65, which he had agreed to pay Dr. Todd for his stock, was not computed in accordance with that formula. He also testified that the price of $58,005.65 was not a "fair price" because it was based in part upon $118,000 in accounts receivable.

As previously stated, the formula as stated in SRA Paragraph 3.2 for application in the event of a stock purchase on or after April 1, 1974, expressly provided that the accounts receivable, discounted by 25 percent, would be included in determining the purchase price per share. However, the formula, as stated in the SRA Paragraph 3.1 for application in the event of a stock purchase prior to that date, provides only that "the purchase price of each share shall be $22.50 plus or minus any increase or decrease in the adjusted net worth per share" of the outstanding stock.

The complaint in this case was then filed, alleging in Count I that plaintiffs relied upon the advice of Mr. Kell in executing the stock purchase agreement and promissory note dated June 1, 1973, that:

> "Lee Davis Kell was negligent in advising plaintiffs to execute the agreements and the promissory note attached as Exhibits 'D' and 'E' in that he knew, or in the exercise of the reasonable care expected of an attorney, should have known that the purchase price should have been determined under paragraph 3.1 rather than 3.2 of the April 1, 1972 stock retirement agreement."

that:

> "Plaintiffs first learned on or about March 17, 1975 that paragraph 3.1 rather than paragraph 3.2 should have been used in determining the correct purchase price for retiring the shares of stock held by Robert C. Todd in the Corporation."

and that:

> "The purchase price for retiring the shares of stock of Robert C. Todd under paragraph 3.1 of the April 1, 1972 agreement would have been $14,026.18, rather than the sum of $58,005.65, which plaintiffs agreed to pay upon the advice of Lee Davis Kell, and as a direct result of the negligence of Lee Davis Kell, plaintiffs were damaged in the sum of $43,979.47."

Defendants' answer, in addition to denying these allegations, alleged as an affirmative defense that any damage suffered by plaintiffs was due to their own contributory negligence.

[ 540 ]

"In approving of the figures and computations used in defendant's letter of May 8, 1973 and subsequent letters without indicating plaintiffs felt such figures were incorrect, if they were so;"

and

"In failing to exercise due care under all the circumstances and conditions then and there existing."

After a trial before a jury, in which the defense of contributory negligence was submitted to it under an instruction not excepted to by defendants, the jury rejected that defense and returned a verdict in favor of plaintiffs in the sum of $23,005.65.

In considering the defense of contributory negligence the jury was not required to believe the testimony offered by defendants, which contradicted much of the testimony of plaintiff Daskalos. Instead, the jury was entitled to believe the testimony of Dr. Daskalos and it could properly find from that testimony, together with the evidence previously referred to, that he understood at all times the price of $58,005.65, as provided in the buy-out agreement, was based upon the formula applicable under the terms of the SRA; that the applicable formula under the SRA was as provided in Paragraph 3.1; that he was not then aware of the fact that the purchase price of $58,005.65 included items which would have been improper had the price been computed under that formula; and that, as a result, he was not guilty of contributory negligence.

It may be that had the members of this court been sitting as the jurors in this case we would not have believed the testimony of Dr. Daskalos and would not have drawn these inferences from the evidence. We cannot say, however, that the jury was not entitled to do so. It follows, in our opinion, that the trial court erred in finding that plaintiffs were guilty of contributory negligence as a matter of law and in the entry, on its own motion, of an order setting aside the jury

[ 541 ]

verdict and the judgment based on that verdict and requiring a new trial.

Plaintiffs also assign as error the refusal of the trial court to instruct the jury under the law of comparative negligence, rather than the law of contributory negligence. Because, however, of our holding that there was sufficient evidence from which the jury could have properly found that plaintiffs were not guilty of any contributory negligence; that the trial court erred in its order requiring a new trial; and that the verdict and judgment in the sum of $23,005.65 should be reinstated, it becomes unnecessary to consider this further assignment of error.

*Other possible grounds for new trial.*

Defendants contend that even if it was not proper for the trial court to order a new trial based upon its holding that plaintiffs were guilty of contributory negligence as a matter of law, "there are four additional bases upon which a new trial could have been granted" and which this court may consider by reason of ORS 19.130(2).[3]

First, defendants contend that the trial court erred in denying defendants' motion for a new trial. In support of that contention defendants say that the verdict "assessed damages in an amount entirely unrelated to the pleadings," indicating substantial confusion on the part of the jury and compromise on the issues of negligence and damages.

It appears from the record, however, that Dr. Todd testified, at one point, that he would have sold his

---

[3] ORS 19.130(2) provides:

"Where in the trial court a motion for judgment notwithstanding the verdict and a motion for a new trial were made in the alternative, and an appeal is taken from a judgment notwithstanding the verdict or an order granting a new trial, the court to which the appeal is made may consider the correctness of the ruling of the trial court on either or both motions if such ruling is assigned as erroneous in the brief of any part affected by the appeal, without the necessity of a cross-appeal."

*See also Artman v. Ray,* 263 Or 529, 533, 501 P2d 63, 502 P2d 1376 (1972).

shares for $35,000. The amount awarded by the jury, the sum of $23,005.65, was the exact amount by which the price paid by plaintiffs (the sum of $58,005.65) exceeded the amount which Dr. Todd said that he would sell his shares for. Although it may be speculative to say that this was the basis upon which the jury arrived at its verdict, we cannot say, to the contrary, that the jury acted improperly in its award of damages in that amount, much less that such an award is an indication of confusion and compromise on the issues of negligence and damages.

Next, defendants contend that the trial court erred in denying their motion to strike the first count of plaintiffs' complaint. In support of that contention defendants say that "the evidence is clear that Dr. Daskalos fully understood and knowingly agreed to both the formula being utilized and the amount derived therefrom" and that "the [trial] court properly found that Plaintiff's negligence was greater than that of Defendant Kell," with the result that "[d]efendant was substantially prejudiced by the submission of Count I to the jury."

For the reasons previously stated, however, sufficient evidence was offered by plaintiffs to support a finding by the jury that Dr. Daskalos did not so "fully understand and agree" and that plaintiffs were not guilty of contributory negligence. It follows that it was not error to submit Count I to the jury.

Defendants next contend that the trial court erred "in failing to instruct the jury as to the limited probative value of answers to hypothetical question." In support of that contention defendants say that answers to hypothetical questions by plaintiffs' expert witness "substantially misrepresented to the jury the standard of care applicable to Defendant attorney under the circumstances of this case" and that, as a result, the trial court erred in failing to give Uniform

Jury Instruction No. 2.08, for which defendants say that they took proper exception.[4]

■ It appears from the record, however, that defendants had not previously requested that the court give that instruction and that its only exception to the instruction given by the court was that "I did not detect any instruction on the hypothetical question." Under these circumstances, the failure to give the instruction now urged by defendants was not a proper ground for the granting of a new trial.

Finally, defendants contend that the trial court erred in "failing to limit plaintiff's recovery on Count III to the amount supported by the evidence." In support of that contention defendants say that the prayer of plaintiffs' complaint under Count III was for the sum of $11,272.50, but that the testimony of the accountant offered by plaintiffs under that count "supported a figure of $9,937" and that "no evidence was presented to support a finding for any larger amount," but that the jury was nevertheless instructed that under Count III it could return a verdict of $11,272.50.

■ It may be that the jury, in returning a general verdict in favor of plaintiffs in the sum of $23,005.65, based such a verdict entirely upon Count I (in which plaintiffs' prayer was for $43,979.47). We have said, however, that "to speculate concerning the mental processes of juries is forbidden to the courts." *See DeMaris v. Whittier*, 280 Or 25, 31, 569 P2d 605 (1977).

The extent of any possible prejudice suffered by defendants as the result of such an error, however, was limited to the difference between the amount prayed

---

. [4]Uniform Jury Instruction No. 2.08 is as follows:

"Questions have been asked in which a witness was requested to assume that certain facts were true, and to give an opinion based on those assumed facts. These are called hypothetical questions. In deciding what weight, if any, to give to an opinion based on a hypothetical question, you should consider whether the facts relied upon by the witness were established by the evidence."

for in Count III (the sum of $11,272.50) and the amount supported by plaintiffs' proof (the sum of $9,937), i.e., the sum of $1,335.50.

Accordingly, we hold that the judgment in this case be reduced from $23,005.65 to $21,670.15 unless plaintiffs prefer a new trial. We do not believe, however, that any good purpose would be served by remanding this case for a new trial under these circumstances, unless demanded by plaintiffs.

For all of these reasons, this case is reversed and remanded for entry of judgment in reduced amount or new trial.